Tina LEAL, Appellant,

v.

TEXAS DEPARTMENT OF PROTECTIVE AND REGULATORY SERVICES, Appellee.

No. 03–98–00516–CV.

Court of Appeals of Texas, Austin.

July 27, 2000.

Linda Icenhauer–Ramirez, Icenhauer–Ramirez & Hubner, P.C., Austin, for Appellant.

Sally Swanson, Asst. Dist. Atty., Austin, for Appellee.

Before Chief Justice ABOUSSIE, Justices B.A. SMITH and YEAKEL.

MARILYN ABOUSSIE, Chief Justice.

Appellant Tina Leal appeals from a decree terminating her parent-child relationship with her four children and appointing appellee Texas Department of Protective and Regulatory Services (the Department) permanent managing conservator.[1] We will affirm the decree of termination.

## BACKGROUND

Appellant married Eliazar Leal in 1981. They had four children: S.L.L., born October 24, 1990; E.R.L., born November 3, 1992; C.J.L., born July 5, 1994; and S.Z.L., born May 27, 1995. In May 1995, S.L.L. made an outcry statement to Ms. Leal that Mr. Leal had sexually abused her. Ms. Leal notified the authorities of S.L.L.'s allegations. Later that year, Mr. Leal was convicted of sexually assaulting S.L.L. and was sentenced to two life terms' imprisonment. He remained incarcerated at the time of trial in June 1998.

Between February of 1995 and September of 1997, the Department received thirteen referrals about appellant and her children. On August 8, 1997, the Leals' neighbor called 911 to report that the Leal children were unsupervised and playing in the street and that one of them had thrown glass at another child. Responding to the call, Austin Police Officer Loren-

---

1. The decree also terminated the parental rights of Eliazar Leal, the children's father, who subsequently died. On motion of Mr. Leal's counsel, this Court dismissed his appeal.

zo Cyphers arrived at the Leal residence and was allowed inside by the two older children. Cyphers testified that the house had a "strong, foul odor." He asked to see a parent, at which time S.L.L. told him that her mother was asleep. When S.L.L. was unable to wake Ms. Leal, Cyphers began calling her name and proceeded to the bedroom where Ms. Leal was sleeping. Ms. Leal eventually awoke and emerged from the bedroom. Cyphers called his supervisor, Sergeant John Neff, to the house. Neff testified that there was food on the walls, furniture, and floor; that flies, maggots, roaches, gnats, and other insects covered the floor and the spoiled food; and that the house reeked of urine and feces. He also stated that the children were dirty, that they were not wearing shoes, and that their clothing was filthy. Neff further testified that the odor in the house was so bad, he had to step outside several times to avoid vomiting.

At that time, the officers asked Ms. Leal about the state of her home. Ms. Leal replied that the filthy condition of the house resulted from her children's failure to clean up after themselves and was in no way her fault. The officers contacted Child Protective Services (CPS), at which time Ms. Leal and the four children retreated into the bedroom and blocked the door. Eventually, S.L.L. climbed through a bedroom window and reentered the house to go to the bathroom. The officers placed S.L.L. in a patrol car, whereupon Ms. Leal and the other three children came out of the bedroom. A CPS worker arrived a short while later and removed the children.

On August 11, 1997, the Department filed its petition seeking termination of the parent-child relationship between Ms. Leal and her four children. The Department alleged that Ms. Leal knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being; that she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being; and that termination was in the best interest of the children. *See* Tex. Fam.Code Ann. § 161.001(1)(D), (E), (2) (West Supp.2000).

The Department returned the children to Ms. Leal on August 25, 1997, because she had made some progress in cleaning the home. But, on September 26, 1997, after Ms. Leal failed to maintain any improvement and had allowed the home to return to an unhealthy state, the Department again removed the children. The Department then pursued this termination action.

At the conclusion of the trial, the jury found that the parent-child relationship between Ms. Leal and her children should be terminated because: (1) termination was in the best interest of the children; and (2) she had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the children's physical or emotional well-being or, alternatively, (3) she had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being. *See id.* The trial court rendered judgment on the verdict, from which Ms. Leal brings this appeal.

A court may terminate a parent-child relationship if it finds that: (1) the parent has engaged in any of the specific conduct enumerated in the Family Code as grounds for termination; and (2) termination is in the child's best interest. *See id.* § 161.001(1), (2); *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex.1987); *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex.1976). In six points of error, Ms. Leal contends that the evidence is legally and factually insufficient to support the verdict. Thus, she argues, the judgment must be reversed.

## DISCUSSION

### Standard Of Review in Cases Requiring Proof by Clear and Convincing Evidence

The natural right existing between a parent and child is one of constitu-

tional dimensions. *See Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex.1976). Therefore, the involuntary termination of parental rights interferes with fundamental constitutional rights. *See Holick v. Smith*, 685 S.W.2d 18, 20 (Tex.1985); *In re G.M.*, 596 S.W.2d 846, 846 (Tex.1980); *see also Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (characterizing parental rights as "essential" and "a basic civil right of man"). Involuntary termination proceedings must be strictly scrutinized in favor of preserving the relationship. *See Holick*, 685 S.W.2d at 20.

▆▆▆ Most civil actions require that disputed issues of fact be resolved by a preponderance of the evidence. *See Sanders v. Harder*, 148 Tex. 593, 227 S.W.2d 206, 209 (1950). In light of the grave nature of the proceedings and the constitutional rights implicated, the Texas Supreme Court adopted the "clear and convincing" standard of proof for the trial of actions seeking termination of parental rights. *See G.M.*, 596 S.W.2d at 847. The legislature amended the Family Code to require that grounds justifying termination be proven by clear and convincing evidence. *See* Act of May 24, 1995, 74th Leg., R.S., ch. 709, § 1, 1996 Tex. Gen. Laws 3745 (codified at Tex. Fam.Code Ann. § 161.001, since amended). Clear and convincing evidence means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established. *See State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979); Tex. Fam.Code Ann. § 101.007 (West 1996). Clear and convincing evidence is an intermediate standard of proof falling between the lesser burden of preponderance of the evidence and the greater standard of proof beyond a reasonable doubt required in criminal proceedings; it applies in only limited instances. *See Ellis County State Bank v. Keever*, 888 S.W.2d 790, 792 (Tex.1994); *G.M.*, 596 S.W.2d at 847; *Addington*, 588 S.W.2d at 570. The purpose of the standard of proof is to

instruct the fact finder as to the degree of confidence it should have in its decision so as to assure correctness of the factual conclusion; to allocate risk between the parties; and to indicate the relative importance attached to the ultimate decision. *See G.M.*, 596 S.W.2d at 847.

Although it is clearly established that the grounds for terminating a person's parental rights must be proven by clear and convincing evidence in the trial court, the correct standard of review an appellate court should apply in an appeal of the matter has been less certain. Some courts of appeals have held that the heightened burden of proof at the trial court requires an intermediate standard of review on appeal while others have held that the standard remains unchanged. *Compare Spangler v. Texas Dep't of Protective & Regulatory Servs.*, 962 S.W.2d 253, 257 (Tex.App.—Waco 1998, no pet.); *In re B.R.*, 950 S.W.2d 113, 117–19 (Tex. App.—El Paso 1997, no writ); *Edwards v. Texas Dep't of Protective & Regulatory Servs.*, 946 S.W.2d 130, 135–37 (Tex. App.—El Paso 1997, no writ); *In re H.C.*, 942 S.W.2d 661, 663–64 (Tex.App.—San Antonio 1997, no writ); *Slatton v. Brazoria Co. Protective Servs. Unit*, 804 S.W.2d 550, 556 (Tex.App.—Texarkana 1991, no writ); *Williams v. Texas Dep't of Human Servs.*, 788 S.W.2d 922, 926 (Tex.App.—Houston [1st Dist.] 1990, no writ), *overruled, In re J.N.R.*, 982 S.W.2d 137, 143 (Tex.App.—Houston [1st Dist.] 1998, no pet.); *In re L.R.M.*, 763 S.W.2d 64, 66 (Tex.App.—Fort Worth 1989, no writ); *Neiswander v. Bailey*, 645 S.W.2d 835, 835–36 (Tex.App.—Dallas 1982, no writ) (applying intermediate standard of review), *with J.N.R.*, 982 S.W.2d at 143; *In re D.L.N.*, 958 S.W.2d 934, 940 (Tex. App.—Waco 1997, pet. denied); *Spurlock v. Texas Dep't of Protective & Regulatory Servs.*, 904 S.W.2d 152, 155–56 (Tex. App.—Austin 1995, writ denied); *In re J.J.*, 911 S.W.2d 437, 439–40 (Tex.App.—Texarkana 1995, writ denied); *In re R.D.S.*, 902 S.W.2d 714, 716 (Tex.App.—Amarillo 1995, no writ); *Faram v. Ger-*

*vitz–Faram,* 895 S.W.2d 839, 843 (Tex. App.—Fort Worth 1995, no writ); *In re J.F.,* 888 S.W.2d 140, 141 (Tex.App.—Tyler 1994, no writ); *In re A.D.E.,* 880 S.W.2d 241, 245 (Tex.App.—Corpus Christi 1994, no writ) (declining to apply intermediate standard); *see also* Bill Vance, *The Clear and Convincing Evidence Standard in Texas: A Critique,* 48 Baylor L.Rev. 391 (1996). Currently, only a few courts of appeals employ what they term a heightened standard of review. *See, e.g., Spangler,* 962 S.W.2d at 257; *Edwards,* 946 S.W.2d at 135–37; *H.C.,* 942 S.W.2d at 663–64; *Neiswander,* 645 S.W.2d at 835–36.

We have held that the heightened standard of proof required in the trial court does not alter the factual sufficiency standard of review in the appellate court. *See D.O. v. Texas Dep't of Human Servs.,* 851 S.W.2d 351, 353 (Tex.App.—Austin 1993, no writ). But our holding to that effect does not mean that we review every trial court decision to see whether the fact in dispute has been shown by a mere preponderance of the evidence. Just as the factual sufficiency review of a trier of fact's verdict in a criminal case necessarily incorporates the State's burden to prove its case beyond a reasonable doubt, the factual sufficiency review of a civil appeal necessarily incorporates the burden of proof the proponent was required to meet at trial. *See Johnson v. State,* 23 S.W.3d 1, 10–11 (Tex.Crim.App. Feb.9, 2000); *Clewis v. State,* 922 S.W.2d 126, 129 (Tex.Crim. App.1996); *Stone v. State,* 823 S.W.2d 375, 381 (Tex.App.—Austin 1992, no pet.); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 662 (1951); *see also Meadows v. Green,* 524 S.W.2d 509, 510 (Tex.1975) (per curiam) ("In Texas there are but two standards by which evidence is reviewed: factual sufficiency and legal sufficiency."). Thus, our factual sufficiency review of the

evidence in a termination case necessarily incorporates whether the challenged finding has been proven by clear and convincing evidence. *See D.O.,* 851 S.W.2d at 355 (holding record contained clear and convincing evidence that was factually sufficient); *Baxter v. Texas Dep't of Human Resources,* 678 S.W.2d 265, 267 (Tex. App.—Austin 1984, no writ).

We believe that our sister courts of appeals in fact employ this same exercise in reaching a decision, despite our corporate difficulty in articulating the standard and confusion of terminology in opinions. Indeed, many courts use the term "clear and convincing" or its definition in formulating their "intermediate" standard and asking whether the trier of fact could have found the evidence to reach the required threshold. *See, e.g., Spangler,* 962 S.W.2d at 257 ("[C]ourt of appeals will only sustain a point of error alleging insufficient evidence if the trier of fact could not reasonably find the existence of the fact to be established by clear and convincing evidence."); *Edwards,* 946 S.W.2d at 135–37 ("Under this standard, we must consider whether the evidence was sufficient to produce in the mind of the fact finder a firm belief or conviction as to the truth of the allegations sought to be established."); *H.C.,* 942 S.W.2d at 663–64 ("In reviewing a jury's findings based on a clear and convincing standard, we ask ourselves whether sufficient evidence was presented to produce in the mind of a rational factfinder a 'firm belief or conviction as to the truth of the allegations sought to be established.'"); *Neiswander,* 645 S.W.2d at 835–36 ("[I]t is the duty of the appellate court in reviewing the evidence to determine ... whether the trier of fact could reasonably conclude that the existence of the fact is highly probable."[2]). Indeed, courts have "rejected" the "intermediate" standard but have still taken the burden at trial into consid-

**2.** Several courts have noted that " 'highly probable' is merely a synonym for 'clear and convincing.' " *Spangler v. Texas Dep't of Protective & Regulatory Servs.,* 962 S.W.2d 253, 257 (Tex.App.—Waco 1998, no pet.); *Edwards*

*v. Texas Dep't of Protective & Regulatory Servs.,* 946 S.W.2d 130, 137 n. 1 (Tex.App.—El Paso 1997, no writ); *In re L.R.M.,* 763 S.W.2d 64, 66 (Tex.App.—Fort Worth 1989, no writ).

eration on review. *See, e.g., Faram,* 895 S.W.2d at 843 ("Simply put, appellate courts must find the measure of clear and convincing evidence sufficient to support the judgment of the trial court."); *D.O.,* 851 S.W.2d at 355 ("After careful review of this record, we are persuaded that clear and convincing evidence exists that is both legally and factually sufficient to support the trial court's finding. . . .").

■ The requirement of clear and convincing evidence is merely another method of stating that a cause of action must be supported by factually sufficient evidence to prove the matter at issue by the required burden of proof. *See Meadows,* 524 S.W.2d at 510. Although there are three standards of proof that may govern the trial of an issue—proof by a preponderance of the evidence, proof by clear and convincing evidence, and proof beyond a reasonable doubt—there are only two standards by which an appellate court may review evidence regarding an adverse finding on the issue—legal sufficiency and factual sufficiency. *See id.; Faram,* 895 S.W.2d at 843.

■ Therefore, in an involuntary termination case, the trial court requires the movant to prove its allegations by clear and convincing evidence. The party complaining of an adverse finding may then bring both a legal and factual sufficiency challenge on appeal, and we review the finding in light of the burden of proof at trial.

■ In deciding a legal sufficiency challenge to an adverse finding on an issue on which the appellant did not have the burden of proof, we consider only the evidence and inferences tending to support the finding and disregard all evidence to the contrary. If more than a scintilla of probative evidence supports the finding, it must be upheld. *See Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *King's Estate,* 244 S.W.2d at 661. In determining a factual sufficiency challenge, we consider a neutral review of all the evidence, both for

and against the finding, and will set aside the judgment only if proof of the fact is so obviously weak or the finding so contrary to the weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Garza,* 395 S.W.2d at 823. We will not substitute our judgment for that of the trier of fact merely because we reach a different conclusion. *See Westech Eng'g., Inc. v. Clearwater Constructors, Inc.,* 835 S.W.2d 190, 196 (Tex.App.—Austin 1992, no writ); *see also Hann v. Texas Dep't of Protective & Regulatory Servs.,* 969 S.W.2d 77, 82–83 (Tex.App.—El Paso 1998, pet. denied) (noting that even under "intermediate" level of review, fact finder's resolution of conflicting evidence generally regarded as conclusive). Applying these standards of review to the facts before us, we hold the evidence to be both legally and factually sufficient to sustain the verdict.

### Best Interest of the Children

■ In points of error five and six, Ms. Leal complains that the evidence is legally and factually insufficient to support the jury's finding that termination was in the children's best interest. The Texas Supreme Court has recognized several factors that may be considered in determining whether termination is in a child's best interest:

(A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse of the acts or omissions of the parent.

*Holley,* 544 S.W.2d at 372 (footnotes omitted). This list of relevant considerations is not exhaustive; other factors may be considered when appropriate. *See id.* Likewise, a fact finder is not required to consider all of the listed factors. *See id.* The record in this case contains evidence regarding several of the *Holley* factors.

### 1. *Desires of the children*

The record contains limited evidence of the children's desires. Initially, S.L.L. expressed a desire to return to her mother but has since indicated to her foster parents and therapists that she does not wish to return home because she fears that her mother will not permit her to continue seeing the therapist she likes. S.L.L. has also expressed concern about the condition of the house and whether she and her brothers would be safe.

### 2. *The emotional and physical needs of the children*

All the children have various physical or developmental problems that require attention. C.J.L. appears to have the most serious problems; he has a tethered spinal cord and a type of spina bifida. Because of these conditions, when C.J.L. was born, doctors told Ms. Leal not to place him on his stomach unless someone who could perform cardiopulmonary resuscitation ("CPR") was present. The child also had problems with reflux and urination stemming from his spinal condition.

Joann Pope, an early intervention specialist who works with developmentally delayed children, testified that Ms. Leal appeared to keep C.J.L. in his baby swing more than was healthy, and as a result, C.J.L. had difficulty rolling over. Pope testified that, even after she explained that she was certified in CPR, Ms. Leal would not let her take C.J.L. out of the baby swing.

C.J.L.'s foster mother testified that some of his medical problems disappeared quickly or never surfaced at all while C.J.L. lived in her home. For instance, C.J.L. never suffered from reflux in the foster home. The foster mother consulted a doctor who indicated that C.J.L.'s difficulty in digesting solid food may have resulted from Ms. Leal's feeding him only liquids, thereby preventing him from developing the ability to digest solid foods—that is, Ms. Leal fed C.J.L. liquids because he choked on solid food, but he choked on solid food because Ms. Leal gave him only liquids.

In addition to C.J.L.'s medical problems, the children, particularly the older two, also have emotional problems that need attention. Several psychologists, therapists, and social workers testified that S.L.L. will require extensive, long-term counseling to deal with her sexual abuse and that E.R.L. has difficulty controlling his anger and needs anger-management therapy. Ms. Leal testified that E.R.L. punched holes in the walls of their home.

Finally, the record indicates that, at the time of removal, all four children were developmentally delayed to varying extents. But at the time of trial, although the children were still somewhat delayed, all showed significant improvement in their new environments.

### 3. *The emotional and physical danger to the children*

The record contains evidence of several instances in which Ms. Leal placed her children in grave danger. First, she kept a bowl full of her various medications on the floor or bedside table, where the children had easy access. Dr. Bernard Cordoba, a psychiatrist who had prescribed some of the anti-depressants Ms. Leal kept in the bowl, testified that ingesting as few as five tablets could kill a child. Also, Ms. Leal made no effort to keep kitchen knives out of the reach of the children. On one occasion, E.R.L. pulled down one of the knives and cut C.J.L.'s finger with it. A CPS caseworker testified that she asked Ms. Leal to move the knives but that Ms. Leal declined, claiming that the children would still be able to get them.

On more than one occasion, Ms. Leal left her very young children, including an infant, alone in her car.

The general condition of the house also presented a danger to the children's well-being. As described above, the floors were covered with spoiled food and insects. In addition, there were feces smeared on the walls in the living room and the bathroom. Ms. Leal testified that E.R.L. smeared the waste, calling it an "art project" and that, although she knew it was unsanitary, she did not clean it up because the child asked her not to disturb his work.

The emotional danger in which Ms. Leal placed her children is well demonstrated by an incident involving Ms. Leal's attempted suicide. In August 1995, Ms. Leal tried to kill herself by ingesting several medications along with alcohol. Once she had taken the pills, she lay in the bed where her four children were sleeping. Ms. Leal testified that she did not believe the children would have been affected if she had been successful in her attempt and the children had awakened to find her dead.

### 4. *Ms. Leal's parental abilities*

The record contains evidence revealing Ms. Leal's seriously deficient parenting skills and her inability to make informed decisions regarding her children. She suffered from depression that interfered with her ability to care for her children. In a videotaped interview,[3] S.L.L. described ways in which her mother had failed to provide for the needs of S.L.L. and her brothers. For example, S.L.L. was often responsible, at age six and younger, for making sure she and her brothers were fed. S.L.L. was also frequently absent from school because Ms. Leal would not wake up to take her.

Evidence also reflects that Ms. Leal failed to provide her children with sanitary conditions in their home. As described above, the house was filthy and unsafe the day the children were initially removed. Numerous witnesses, including the CPS caseworker, Ms. Leal's therapist, and a social worker, testified that they worked with Ms. Leal to set goals for her to meet regarding her home. Mary Tipps, a social worker with the Department, made approximately twenty-five visits to Ms. Leal's home to help her clean and maintain the house, but the house was not clean for longer than a few short weeks.

Several witnesses, including Mr. Leal, testified that Ms. Leal was inactive when it came to her children and would "parent from her chair"—sitting in a chair in her living room and directing her children from that position. Although Ms. Leal was told she needed to be more active with her children, she made no significant changes in her behavior.

A psychological evaluation revealed that Ms. Leal manifests poor frustration tolerance and gives up easily in stressful situations. The psychologist who administered the test indicated that Ms. Leal's low score could indicate an unwillingness to try rather than an inability to perform.

Finally, evidence indicated Ms. Leal exercised extremely poor judgment where her children were concerned. For instance, she deferred to four-year-old E.R.L.'s request not to clean the feces from the wall even though she knew they posed a health hazard. The evidence also reflects that Ms. Leal treats S.L.L. as a peer rather than a daughter. As an example, Ms. Leal testified that when S.L.L. told her about the sexual abuse, Ms. Leal placed the burden of deciding whether to go to the police on the six-year-old child.

### 5. *Parenting-assistance programs available to appellant*

A number of witnesses, including Ms. Leal, testified to the parenting-assistance

Children's Advocacy Center—was played for the jury and admitted into evidence.

programs Ms. Leal had used.[4] Despite all these programs, several witnesses testified that Ms. Leal showed no significant signs of improvement in her parenting. For instance, Laura Cheal–Smith, a counselor at DayGlo who led a class on protective parenting of sexually abused children, characterized Ms. Leal's overall progress in the class as minimal. And, as discussed above, the record indicates that Ms. Leal took little or no advantage of the assistance offered in maintaining her house.

6. *Acts or omissions by Ms. Leal and excuses for those acts or omissions*

A parent's acts or omissions can also indicate an inappropriate parent-child relationship. *See Holley*, 544 S.W.2d at 372. For example, Ms. Leal spoke regularly with S.L.L. by telephone after the children's removal from the home. Two witnesses testified that Ms. Leal talked in such a way that frightened and worried her daughter and made statements to S.L.L. inappropriate for a parent-child relationship. Similarly, Ms. Leal's failure to keep her house safe and sanitary, as discussed above, is an example of an omission that casts doubt on Ms. Leal's ability to parent effectively.

The Department also presented evidence that Ms. Leal had failed to sever ties with Mr. Leal following his arrest and conviction for the sexual assault of S.L.L. She never divorced Mr. Leal, despite taking some steps toward that end; instead, she visited him in jail on a number of occasions and brought the children with her on some of those visits.

The record indicates that the jury was presented with abundant evidence on the desires and needs of the children, the emotional and physical danger to the children, Ms. Leal's parenting ability, her ability to benefit or not to benefit from assistance with her parenting skills, and her acts or omissions as a parent. Having reviewed all the evidence, we hold that a reasonable jury could have found by clear and convincing evidence that it was in the children's best interest to terminate appellant's parental rights. We overrule Ms. Leal's fifth and sixth points of error.

**Conduct and Surroundings That Endangered the Children**

In her first through fourth points of error, Ms. Leal argues that the evidence is legally and factually insufficient to support a finding that she endangered the children with her conduct or through their surroundings. The jury was instructed that in order to terminate the parent-child relationship, the jury had to find by clear and convincing evidence Ms. Leal endangered the children's physical or emotional well-being *either* by her conduct *or* by means of their surroundings *and* that termination of the parent-child relationship would be in the best interest of the children. Termination would be proper if the jury found either of the above listed grounds to be true. In response to the question, "Should the parent-child relationship between [Ms.] Leal and the children ... be terminated?" the jury answered "yes" as to each child. To affirm the termination decree, we must find that the evidence is legally and factually sufficient to support only one of these

---

4. These programs include: Any Baby Can (stroller); Austin Housing Authority (low-income housing); Caritas (financial assistance); CCMS (free child care); DayGlo (classes for parents of sexually abused children); Department of Protective and Regulatory Services (housecleaning lessons); Early Childhood Education (assistance to children with special educational needs); Early Childhood Intervention Program (assistance to children with special needs); Easter Seals (therapy for C.J.L.); Infant Parent Program (work with E.R.L.); Integrated Mental Health (therapy for Ms. Leal); Mental Health–Mental Retardation (child care); Michael Fund of Brackenridge Hospital (financial assistance with medical bills); Parents Anonymous (parenting classes); Pilot Parent (developmental work with children with special needs); Pride Program of Round Rock (home visits for developmental work with children); Specialty Care Clinic of Brackenridge Hospital (lessons on nutrition and feeding); Travis County Emergency Program (free meat and cheese); and WIC (free baby formula and other food).

bases. For the sake of completeness, we will consider the evidence pertaining to both grounds.

The supreme court has interpreted the term "endanger" for purposes of involuntary termination proceedings. Conduct that endangers a child is more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment. *See Boyd,* 727 S.W.2d at 533. However, it is not necessary for the conduct to be directed at the child or for the child to suffer actual injury. *See id.* Rather, "endanger" means to expose to loss or injury; to jeopardize. *See id.* Unsanitary conditions can qualify as surroundings that endanger a child. *See In re M.C.,* 917 S.W.2d 268, 270 (Tex.1996).

We previously recited evidence of conduct on the part of Ms. Leal that endangered her children both by her conduct and neglect, such that she placed them in danger. For example, evidence indicates that Ms. Leal allowed the children to have access to her medication even though ingesting the medication could have killed the children. Although the children were not actually harmed, Ms. Leal placed them in jeopardy and thus endangered them. *See Boyd,* 727 S.W.2d at 533. Also, in planning to commit suicide in such a way that her children would awaken to find her dead, Ms. Leal jeopardized the emotional well-being of her children. As with the medication, Ms. Leal exposed the children to a threat of loss and thus endangered them. *See id.* In neither instance did Ms. Leal perceive the possible harm or danger, even after the fact. She failed to supervise the children, keep them clean and fed, or see to their educational requirements. She placed inappropriate burdens on her young children and transferred important duties to them that were her responsibility. We hold that a reasonable jury could have found by clear and convincing evidence that Ms. Leal's conduct endangered the physical or emotional well-being of the children.

Many of the facts already recited also support the finding that Ms. Leal knowingly placed or knowingly allowed her children to remain in conditions that endangered their well-being. The record reflects that the Leal home was shockingly unsanitary, evidenced by spoiled food and insects on many of the interior surfaces. There was also a strong odor of urine and feces in the house. A number of witnesses characterized the home as unsafe. For example, the CASA worker testified that she slipped on mayonnaise and ketchup when she walked in the door. Several witnesses also testified about piles of garbage in the house and in the yard. We hold that a reasonable jury could have found by clear and convincing evidence that these conditions created surroundings that endangered the physical or emotional well-being of the children.

After careful review, we are persuaded that the record contains clear and convincing evidence exists that is legally and factually sufficient to support the jury's findings that Ms. Leal: (1) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being; and (2) allowed them to remain in conditions and surroundings that endangered their physical or emotional well-being. Either of these grounds alone support termination when coupled with the finding that termination is in the children's best interest. We overrule points of error one through four.

## CONCLUSION

Because there is legally and factually sufficient evidence to support all three of the challenged findings justifying termination of appellant's parental rights under section 161.001 of the Family Code, we affirm the trial court's decree.