# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00072-CV

**Izzat Davis, Appellant**

v.

**Texas Department of Protective and Regulatory Services, Appellee**

## FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT NO. 175,084-B, HONORABLE RICK MORRIS, JUDGE PRESIDING

Appellant Izzat Davis appeals the order terminating her parental rights to two children. Appellant contends that the order is not supported by sufficient evidence, that the court erred by admitting evidence of her convictions, and that the termination of her parental rights violates her state and federal constitutional rights. We will affirm the judgment.

Appellant and Antonilius Davis, Sr. ("Davis") had two children together—a boy, T.J., born April 24, 1997, and a girl, A.D., born June 29, 1998. Appellee Texas Department of Protective and Regulatory Services ("the Department") removed them from appellant's care after T.J. suffered fourteen brand-like burns in April 1999. Appellant did not seek medical attention for him until a representative from Child Protective Services intervened—at least three days after appellant admits discovering that some of the burns were more than superficial. The boy's assailant was unidentified at the time of trial. There was no evidence of injury to A.D. in this incident.

At trial, the court charged the jury that the court would terminate appellant's parental rights only if the Department proved by clear and convincing evidence that at least one of the following events occurred:

1. The mother has knowingly placed the child in conditions and surroundings which endanger the physical well-being of the child; or

2. The mother has knowingly placed the child in conditions and surroundings which endanger the emotional well-being of the child; or

3. The mother has knowingly allowed the child to remain in conditions and surroundings which endanger the physical well-being of the child; or
4. The mother has knowingly allowed the child to remain in conditions and surroundings which endanger the emotional well-being of the child; or

5. The mother has engaged in conduct which endangers the physical well-being of the child; or

6. The mother has engaged in conduct which endangers the emotional well-being of the child; or

7. The mother has knowingly placed the child with persons who engaged in conduct which endangers the physical well-being of the child; or

8. The mother has knowingly placed the child with persons who engaged in conduct which endangers the emotional well-being of the child.

*See also* Tex. Fam. Code Ann. § 161.001(1)(D) & (E) (West Supp. 2001). The court also charged the jury that parental rights could be terminated only if clear and convincing evidence proved that termination would be in the children's best interest. *See id.* § 161.001(2). The court instructed the jury to consider the following factors in assessing the children's best interest: (1) the desires of the children; (2) the emotional and physical needs of the children now and in the future; (3) the emotional and physical danger to the children now and in the future; (4) the parenting ability of the individuals

2

seeking custody; (5) the programs available to assist those individuals to promote the best interest of the children; (6) the plans for the children of those individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). The jury found that appellant's parental rights should be terminated as to both children.[1]

We first will consider appellant's complaints that the court erred by admitting evidence of her conviction, then address her concerns regarding the evidentiary sufficiency and constitutionality of the termination of her parental rights.

Appellant contends that the district court erred by denying her motion in limine to exclude references to her conviction for voluntary manslaughter of a child. She contends that the prejudice of this evidence outweighed its probative value and that the Department introduced this evidence to enrage rather than inform the jury. Appellant did not, however, raise this objection when evidence of this conviction was repeatedly offered and admitted at trial. She acknowledges that a trial court's denial of a motion in limine does not preserve error. *See In re R.V., Jr.*, 977 S.W.2d 777, 780 (Tex. App.—Fort Worth 1998, no pet.). She contends, however, that the fact that her conviction was mentioned by so many witnesses and documents rendered the "constant vigil" needed to object to all such modes "impractical." She cites no authority and we find none creating such an exception to the requirement of at least an initial objection at trial. *See* Tex. R. App. P. 33.1(a); *see also Chavis v.*

---

[1] The court submitted a similar charge regarding the parental rights of the children's father, omitting items five and six regarding parental conduct that endangers the children's physical and emotional well-being. The father does not appeal the court's termination of his rights in this case.

3

*Director, State Worker's Comp. Div.*, 924 S.W.2d 439, 447 (Tex. App.—Beaumont 1996, no writ). Because appellant did not preserve the error she raises on appeal, we resolve issue two in favor of the judgment.

Appellant's complaint that the evidence is legally and factually insufficient to support termination requires review of the entire record. We must determine whether clear and convincing evidence supports the findings that the parent committed a dangerous act or omission and that termination is in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001 (West Supp. 2001). Clear and convincing evidence is a level of proof between preponderance of the evidence and proof beyond a reasonable doubt; it is the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established. *See* Tex. Fam. Code Ann. § 101.007 (West 1996); *Leal v. Texas Dep't of Prot. & Reg. Servs.*, 25 S.W.3d 315, 319 (Tex. App.—Austin 2000, no pet.). This heightened standard of proof is incorporated into the standard of review. *Id.* at 320. In deciding a challenge to the legal sufficiency of the evidence in a parental rights termination case, we consider only the evidence and inferences tending to support the findings and disregard all contrary evidence. *See id.* at 319 (citing *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965); *In re King's Estate*, 244 S.W.2d 660, 661 (Tex. 1951)). We must uphold the order if it is supported by more than a scintilla of probative evidence. *Leal*, 25 S.W.3d at 321. In determining a factual sufficiency challenge, we review all of the evidence, both for and against the findings, and will set aside the judgment only if the proof is so obviously weak or the findings so contrary to the weight of the evidence as to be clearly wrong and unjust. *See id.* (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza*, 395 S.W.2d at 823)). We will not substitute our judgment

4

for that of the trier of fact merely because we would make a different finding. *See Westech Eng'g., Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 196 (Tex. App.—Austin 1992, no writ).

We begin our chronological review of the evidence with appellant's 1988 conviction for voluntary manslaughter of a child; the victim was one of her four children from previous relationships. In addition to references to the conviction by many witnesses, the Department read into the record testimony from a previous proceeding regarding the child's death. In that prosecution, a neighbor testified that she heard appellant's child crying for an extended period of time and saw appellant shake the child to quiet her, then extend her arms as if she had thrown the child. The neighbor heard a sound, heard appellant say, "Now will you shut your damn mouth," and then heard only silence; the neighbor did not see the child alive again. (In this termination case, appellant denied causing her child's death. She posited that the child died of heat stroke.) Appellant was convicted of voluntary manslaughter by various means of causing trauma to the child's head.

When appellant went to prison, her two surviving children were placed permanently with their maternal grandmother. In 1991, appellant was placed on parole until 2009 and released from prison. Appellant's next child, born in 1993, also was placed with appellant's mother. T.J., born in April 1997, was initially removed from appellant's care, but was returned to her and Davis at six months of age.

T.J.'s weight was the subject of much testimony. He weighed nine-and-a-half pounds at birth. When he was returned to appellant and Davis at six months, he weighed twenty-one-and-a-half-pounds—the ninetieth percentile for weight for his age. By June 1998, however, he weighed only sixteen-and-a-quarter pounds; this was well below the twenty-eight pounds his doctor expected

5

him to weigh. His concerned parents took him in for a medical examination. Medical personnel testified that they recommended further testing and called the parents twice to set up appointments, but the parents never followed up; the parents testified that they did not know that the doctors recommended testing. Regina McCollum, a family friend, testified that, though T.J. had been happy and active as a six-month-old, he grew quieter and substantially less active over the next year. She testified that at seventeen months he had lost so much weight that his skin was hanging loosely on him; the parents denied the boy looked that bad and posited that, if he had, doctors and others would have called the Department.

Testimony indicated other causes for concern about T.J.'s health, safety, and development. T.J. went to the emergency room in May 1998 after he reportedly fell from an eight-inch-high chair; appellant said he never lost consciousness but vomited twice. A doctor described this as a severe reaction to such a short fall. T.J. had a similar reaction and another emergency room visit at twenty-one months when a woman reportedly opened a door and knocked him off a three-foot porch and onto a brick. A physician reviewing T.J.'s medical charts at trial said they showed developmental delays and a failure to thrive. McCollum also testified that appellant and Davis tried to potty train T.J. at eleven months, making him sit on his potty chair for hours; others testified that eleven months was too young for such measures. Appellant denied forcing T.J. to stay on the potty chair. McCollum also reported that, during a telephone call with her, appellant spanked T.J. for "looking at her funny."

In September 1998, McCollum volunteered to take T.J. into her home in Oklahoma when he was seventeen months old and Davis was reassigned to Korea for a year. (Appellant moved

6

in with her mother in Belton and kept her daughter with her.) McCollum testified that T.J. ate voraciously while in her care until appellant reclaimed him in December 1998. Appellant and the two children moved into a one-bedroom apartment in Killeen. By April 1999, T.J. was near the fiftieth percentile in weight for his age.

Much of the testimony focused on events from April 18-23, 1999. In early April 1999, Temeeka Garner temporarily moved into appellant's apartment with her three children. Also in the apartment sometimes during this period was Jerry Gibson, an army officer who was married to someone else. Also staying in the apartment for part of April were three children of another friend who was in jail. On April 17, 1999, appellant's three older children also stayed in the apartment. Appellant returned her three older children to her mother's home on the morning of April 18.

Appellant said that, on her return that afternoon, Garner told her that T.J. had gotten her curling iron and burned himself. Appellant said she saw a couple of red places on his legs. She testified that she treated them with antibiotic lotion. She said that some burns "popped out" on April 20, 1999; she also began to suspect that Garner was more involved in the burns than she had reported. Appellant also testified that she found T.J. on April 20 with one of Garner's young daughters pulling on his penis. Appellant said she did not see the burns on T.J.'s back, scrotum, and penis, even though she bathed him. She did not take T.J. to the hospital, nor did she call her husband or her mother.

Lorinda Vidal, T.J.'s godmother, picked him up on April 22, 1999 to take him with her and her children on a planned visit to Waco. She said she noticed the burns on his legs when he used the bathroom; she said Garner told her the burns were from a curling iron accident. Vidal did

7

not look for or see the burns on his genitals. She said T.J. played with her children without noticeable discomfort.

Apparently acting on an anonymous tip that T.J. had been injured, the Department's investigator went to appellant's home at 11:30 p.m. on April 22, 1999 looking for T.J., who was still with Vidal. Appellant said she did not know how to get into contact with Vidal. Later, though, appellant went by Vidal's house and picked up T.J. to take him to appellant's mother's house. State investigators located her there and persuaded her to take T.J. to the hospital.

David Hardy, the physician who examined T.J. on April 23, 1999, said he found fourteen burn marks, several bruises, and linear marks consistent with spanking with a switch. Several of the burn marks indicated precise placement rather than glancing blows; for example, the burn on his scrotum did not have an associated burn on the inner thigh as would be expected if he had dropped or accidentally brushed against a curling iron. Some of the burns had distinct edges, indicating that the hot object was pressed into flesh. Hardy testified that some of the burns on T.J.'s legs appeared to have been caused by a lighter. He said the bruises on the backs of T.J.'s arms and legs are consistent with child abuse, possibly caused by someone restraining T.J. while inflicting the burns. The doctor said the number and severity of the burns would take about thirty minutes to inflict; both the number and the severity weighed against accidental infliction. Hardy said the burns on T.J.'s legs would have immediately appeared serious; they would have been partially charred and blistered. The doctor testified that T.J. would have pain when urinating and when the burns rubbed against anything—e.g., when his genitals rubbed against his diaper. He testified that he saw no indication that the burns had been treated.

8

After this examination, the Department took T.J. and his younger sister and placed them with foster parents. The foster father testified that T.J. was in pain from the burns. He said that, for about a month, T.J. would scratch some of the burns until he bled. He also said that T.J. was aggressive toward women (including the foster mother and teachers) and would hit them. T.J. also bit himself.

There was also testimony regarding appellant's psychological state. Frank Pugliese, a psychologist who examined her in 1993 and reviewed subsequent reports on her condition, characterized appellant as having a mixed personality disorder. He found her tense, abrasive, irritable, defensive, and mistrustful. He said she appeared to be overwhelmed by responsibilities and pressures, pessimistic, and cynical. A 1999 examination indicated that these symptoms persisted and were accompanied by an avoidance of responsibility for making decisions. Pugliese found no indications of problems with self-control or aggression, but conceded that these problems sometimes show only under a particularly stressful event or after an accumulation of small stressors. He testified that appellant's problems may cause her to misinterpret expressions and actions by others—e.g., to think a child was looking at her funny. He testified that her mistrust would cause her to distort or hide information regarding child abuse even if she is innocent. He said she might also alter her memories of events (e.g., her daughter's death) in order to shield herself from responsibility. There was evidence that appellant did not take advantage of opportunities for psychological and parenting-skills counseling.

Pugliese also testified regarding the gaps between T.J.'s behavior and those expected for his age; the questions were hypotheticals that appear to be based on McCollum's observations.

9

The psychologist said that seventeen-month-old children tend to run around rather than just sitting. He testified that a child who was seriously underweight and could not walk was having basic physiological needs neglected. Pugliese testified that he would be required to report to the Department if he saw a child whose weight loss caused skin to hang loosely from his body. He agreed, however, that the fact that T.J.'s weight was normal after five months with appellant indicated that she was feeding him sufficiently. He testified that aggression and self-mutilation are signs of post-traumatic stress syndrome in children; though abuse is one trigger for PTSD, Pugliese conceded that removal from parents could also cause it. He also testified that often, if one child is targeted for abuse in a family and that kid is removed, the remaining children may be targeted.

There is very little evidence regarding A.D.'s condition. There is no evidence that she was injured when T.J. was burned; an examination at the time did not reveal any bruises. There is no evidence that she endured the weight fluctuations or deficits that T.J. did. Appellant took A.D. to the emergency room at nine months of age after she fell off of a couch.

Appellant concedes that T.J. suffered burns, but denied that she is responsible for them. There is no direct evidence that she inflicted the burns or knowingly and intentionally allowed them to be inflicted; no witnesses testified to seeing the burning nor was any physical evidence recovered linking anyone to the instrument used to inflict the burns. Appellant asserts that there was no evidence that she knew or should have known that her son's well-being would be endangered by leaving him with Garner. She contends that there was no evidence that her children were below norms for growth and development while under her care; T.J.'s weight was in the fiftieth percentile

10

after five months in her care. There was no evidence of harm to her daughter. There was testimony that she and her husband loved and cared for their children.

We conclude that there is factually and legally sufficient evidence to support the jury's finding that appellant's parental rights to T.J. should be terminated. Regardless of whether appellant was involved in burning T.J., she admitted that she did not seek medical assistance for him until pressed to do so by the Department. Despite knowing that he was burned, she admitted discovering only a few of the burns described by the doctor. She testified that she did not notice the burns on his back or genitals even when she gave him a bath. Some of these burns were so severe they would have immediately showed charring. Some of these burns became infected and took a month to heal. Appellant admitted that she did not seek medical assistance or tell her husband about the burns because she feared the consequences. A jury could reasonably find that the evidence clearly and convincingly shows appellant committing an act that physically endangered T.J. by failing to discover the burns and to seek suitable medical care for them.

The jury's findings are supported by other evidence. The personal characteristics that led appellant to avoid seeking medical help for T.J., coupled with her failure to seek help in changing those characteristics, demonstrate a risk that appellant might in the future forego seeking medical treatment for T.J. His weight loss and her failure to pursue treatment for it after the initial appointment support the finding. The severity of T.J.'s symptoms after his reported fall off of a short chair, his scars from being hit by a switch, and his developmental delays are cause for concern. Looming in the background is the possibility that appellant herself inflicted the burns; regardless, appellant admitted that she allowed Garner to stay in her apartment even after she suspected that

11

Garner might have helped inflict the burns. Appellant's conviction for killing her daughter and her denials of involvement in her daughter's death lend support to the jury's findings, as does her failure to avail herself of opportunities for counseling. There is no evidence of the children's desires, though T.J.'s hostility to mother figures is disturbing. There is no evidence regarding the suitability of a particular placement, but there was testimony that the children were adoptable and could thrive in a more hospitable environment. The evidence is legally and factually sufficient to support the jury's finding that termination is warranted and in T.J.'s best interest.

This evidence also supports the jury's finding that appellant's parental rights to A.D. should be terminated despite the paucity of evidence that A.D. herself was ever physically harmed. The statute and the jury charge require that the Department show that A.D. was physically or emotional endangered. *See* Tex. Fam. Code Ann. § 161.001(1)(E). The supreme court has written that, "[w]hile we agree that 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Misconduct directed towards one child can support a finding that the parent engaged in a course of conduct that endangered another child. *See Trevino v. Texas Dept. of Prot. & Reg. Servs.*, 893 S.W.2d 243, 248 (Tex. App.—Austin 1995, no pet.). The jury reasonably could have concluded that appellant's handling of the burning incident showed, at minimum, a dangerous inattention to her child's physical condition and well-being, a subordination of her child's health to her concerns, and a refusal or inability to take action to improve her child's safety. There is also evidence that if the target of abuse is removed from the home, the abuse will be

12

refocused on a remaining child, increasing the risk to A.D. The evidence shows conduct and characteristics of appellant causing present and future danger to children in her care, indicating that her children's best interest is served by termination of her parental rights. We resolve issue one in favor of the judgment.

By her third issue, appellant contends that termination of her parental rights violates her state and federal constitutional rights. The parties agree that the Department must show that its interest is compelling, that its interest is particularly promoted by terminating the relationship, and that it cannot achieve its goal through less restrictive means before terminating a parental relationship. *See In re S.H.A.*, 728 S.W.2d 73, 91-92 (Tex. App.—Dallas 1987, writ ref'd n.r.e.). Appellant argues that the Department's failure to present clear and convincing evidence to support its case renders the termination unconstitutional; this argument fails because, as discussed above, the Department satisfied its evidentiary burden. Appellant also argues that the Department failed to show that it tried less draconian remedies. The State was faced with clear and convincing evidence that the children were in danger in their home and that the danger would persist. During more than a decade of her intermittent involvement with the child-protection system, appellant failed to meaningfully engage in psychiatric counseling, either through the Department or the army, and did not complete parenting skills training. She distrusted the Department so much that she declined to seek medical treatment for burns that she insisted were inflicted either accidentally or by someone else. Because the Department has a compelling interest in protecting its youngest citizens, because there was no indication that appellant would participate meaningfully in a less intrusive alternative to termination (i.e., a program to remove the danger to her children by improving her parenting skills), and because

13

termination promotes the State's interest in protecting the children by creating the possibility that the children could be adopted into a home in which they can prosper, the Department's actions do not violate the state or federal constitutions. *See S.H.A.*, 728 S.W.2d 73 at 91-92. We resolve issue three in favor of the judgment.

We affirm the judgment terminating appellant's parental rights to T.J. and A.D.

_____

David Puryear, Justice

Before Justices Kidd, B. A. Smith, and Puryear

Affirmed

Filed: December 13, 2001

Do Not Publish