# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-14-00134-CV

---

**W. B., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 425TH JUDICIAL DISTRICT
NO. 12-0026-CPS425, HONORABLE BETSY F. LAMBETH, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A jury concluded that appellant W.B.'s parental rights to his son should be terminated. Appellant contends that the evidence is legally and factually insufficient to support the judgment that termination of his parental rights was in the child's best interest. We will affirm the judgment.

### Preservation of Error

The Department contends that appellant failed to preserve this issue for our review. To preserve a challenge to the legal sufficiency of evidence in a jury trial, a party must either (1) file a motion for instructed verdict, (2) file a motion for judgment notwithstanding the verdict, (3) object to the submission of the issue to the jury, (4) file a motion to disregard the jury's answer to a vital fact issue, or (5) file a motion for new trial. *See In re D.J.J.*, 178 S.W.3d 424, 426–27 (Tex. App.—Fort Worth 2005, no pet.); *see also T.O. Stanley Boot Co. v. Bank of El Paso*,

847 S.W.2d 218, 220 (Tex. 1992).  To preserve a factual-sufficiency challenge for appeal, a party must file a motion for new trial.  *D.J.J.*, 178 S.W.3d at 427; *see also* Tex. R. Civ. P. 324(b)(2).  No such motions appear in the record.  Appellant has not preserved his sole appellate complaint.

In the interest of justice, because of the importance of the rights involved, we will nevertheless review the sufficiency of the evidence.

**Background**

We have reviewed the entire record, but will not exhaustively recount the testimony and evidence presented at trial.  Appellant had an arrest history involving drugs, theft, and assault before he met the child's mother, Darlene.[1]  He was diagnosed as having bipolar disorder and schizophrenia.  He was given medications to treat the conditions, but would periodically choose not to take them.  He also consumed alcohol and/or controlled substances, which sometimes interacted unfavorably with his medications.

By all accounts, appellant and Darlene were a volatile couple.  The child at issue in this case was born in May 2009.  Four months later, the Department investigated a report that appellant and Darlene engaged in violence in the presence of the child and his sibling.  Two months later, appellant was arrested for strangling Darlene.  Although appellant testified that he merely had Darlene handcuffed and in a wrestling hold to calm her—he said she had brandished a knife at him—appellant pleaded guilty to the alleged assault and was placed on probation for four years.

_____

[1] Darlene is a fictitious name used to screen the mother's identity and, consequently, the child's identity.  *See* Tex. R. App. P. 9.8.

During probation, appellant was prohibited from using illegal drugs or alcohol and from threatening or harassing Darlene.

Appellant described periods of apparent calm when he would return from work in the evening and take over the parenting from Darlene. He would play with the child, bathe him, read to him, give him a bottle, and put him to bed. Appellant described days at playgrounds, pools, and stores where he bought the child's favorite toys—cars.

There were two other alleged domestic altercations in 2010, and appellant tested positive for cocaine and methamphetamine use in November 2010. In January 2012, the Department entered an order that permitted appellant visitation with the child, set out services appellant was supposed to participate in, and prohibited appellant from being in the same house with Darlene and the child except for scheduled events. Appellant and Darlene nevertheless began essentially living together at Darlene's brother's house.

In May 2012, following an afternoon drinking at a bar, appellant joined Darlene and her brother drinking whiskey. An altercation then occurred in which Darlene hit appellant in the face, and Darlene suffered a bruise on her head. Eventually, Darlene's brother broke up the altercation, pulling a gun. The child was in the house asleep. Appellant again pleaded guilty and went to prison.

The child stayed a few more days with his uncle, then went to live with appellant's father and stepmother for a couple of months before they completed a planned move out of the United States in early July 2012. The child then lived with his maternal grandmother until she was diagnosed with terminal lung cancer in late August 2012; she died a few months later. The child

3

entered the foster care system, but left his first foster placement after he was caught physically assaulting a younger child in October 2012. He then moved to the foster home where he remained through the trial in January 2014. All of these transitions were abrupt. He also began therapy in the fall of 2012.

The Department intended to reunite the child and Darlene, but Darlene continued to struggle with substance abuse. The Department's plan shifted to termination, then back to reunification because of Darlene's alternating lapses and successes in this struggle. When Darlene was irregular with her visitation schedule, the child suffered emotionally. As Darlene grew more reliable and the child acquired coping and communication skills, his anxiety and rage seemed to abate somewhat.

Appellant participated in the services available at the prison, including a class on reintegrating into society and a cognitive intervention class. He was released from prison to a transitional facility in September 2012. During his two months there, he and the Department's caseworker did not communicate and appellant did not engage in required services. Appellant required an adjustment of his medications in October, an emergency procedure that coincided with the caseworker's attempt to visit him.

In November 2012, Darlene died in a car accident on her way to a scheduled visit with the child. This caused the child grief and behavioral disruptions. Days later, appellant was released to a halfway house, and his mother and stepfather attempted to help him progress toward a job and stability by getting him a truck and starting the process for getting a driver's license. Appellant promised not to drive the vehicle until he was licensed.

On November 25, 2013, the trial court denied appellant's request for visitation with the child. On November 27, 2013, appellant drove to downtown Austin, drank alcohol, and crashed his truck while intoxicated. He was arrested, handcuffed, and placed into a police car in which he pounded his head on the glass and kicked the door.

**Applicable Standards**

A trial court can order termination of a parent-child relationship only if the trial court finds by clear and convincing evidence that the parent has committed one of several acts or omissions that are grounds for termination and that termination is in the child's best interest. *See* Tex. Fam. Code § 161.001. Appellant does not challenge the jury's implicit finding of the grounds for termination. *See id.* § 161.001(1). His appeal focuses on the second prong of the test—the child's best interest.

There is a strong presumption that the best interest of a child is served by keeping custody in the natural parent. *In re D.T.*, 34 S.W.3d 625, 641 (Tex. App.—Fort Worth 2000, pet. denied). There are a number of factors that may be considered.[2] We review the record to

---

[2] Some of the common factors that courts use to evaluate the best interests of a child include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). This list of relevant considerations is not exhaustive, and a factfinder is not required to consider all of the listed factors. *See id.*; *see also Leal v. Texas Dep't of Prot. & Regulatory Servs.*, 25 S.W.3d 315, 322 (Tex. App.—Austin 2000, no pet.) *disapproved on other grounds by J.F.C.*, 96 S.W.3d 256, 267 n.39 (Tex. 2002).

determine if clear and convincing evidence supports the judgment, which means that a factfinder could form a firm belief or conviction about the truth of the State's allegations. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 266-67 (Tex. 2002). In the legal-sufficiency review, we examine the evidence in the light most favorable to the finding of best interest, assuming that the factfinder resolved disputed facts in favor of the finding and disregarded incredible evidence if it could do both reasonably. *J.F.C.*, 96 S.W.3d at 266. In the factual-sufficiency review, we must decide in light of the entire record whether the factfinder could reasonably have formed a firm belief or conviction that termination was in the child's best interest. *Id.* at 266-67.

The recurrent theme at trial was the child's need for stability and structure and appellant's inability to provide that in the future. While appellant and others testified about his love for the child, times of stability, bonding routines, and the absence of any incidents in which he physically harmed the child, there was also testimony showing appellant's failures to prioritize his child's need for stability above his desire to self-medicate and the toll those failures helped inflict. The results included domestic-violence incidents that brought the Department into their lives and removed appellant from his child's company. The incidents prompted probation and family court orders intended to protect the child that appellant nevertheless violated by using alcohol and drugs and living with Darlene. Appellant went to prison, and the child endured a series of five homes in less than seven months, leaving the child raging and prone to separation anxiety. Just weeks after Darlene's death, the trial court denied appellant's request for visitation. Appellant then drove his truck without a license and contrary to his promise to his mother, drank in violation of court orders and in conflict with his medications, drove while intoxicated, and crashed his truck that contained

6

passengers. This incident encapsulated the continuing risks that appellant's relationship posed to his child. While many factors may have contributed to appellant's decisions, the jury could easily have concluded that these factors did not excuse his actions or ease concerns about the risks his continuing parental relationship presented for the child.

The jury could have reasonably determined that appellant could not reliably provide for the child's emotional and physical needs and posed a potential danger to his emotional and physical well-being then and in the future. The jury could have reasonably found that appellant's history of instability overshadowed and cast doubt on his ability to consistently use good parenting skills. Although appellant testified that his incarceration and classes helped him see the costs of his "rip-and-run" lifestyle and that he was on his way to re-establishing a stable life in which he could provide for the child, he admitted he had not done so at the time of trial.

The Department planned to keep the child in the foster placement that had been his home for the previous quarter of his life, then transition him to his maternal aunt and uncle who wished to adopt him although they had not seen him in nearly two years. The undisputed testimony was that this couple could provide the child with the stability, structure, and support that they were providing to the aunt's adolescent children. The aunt testified that she would allow appellant's mother and stepfather to visit the child, and might allow appellant to visit if it were in the child's best interest. Other witnesses testified that termination of parental rights did not equate to a prohibition of visitation or involvement by appellant in the child's life.

7

## Conclusion

We conclude that legally and factually sufficient evidence supports the jury's finding by clear and convincing evidence that termination of appellant's parental rights was in the child's best interest.  We affirm the judgment.

_____

Jeff Rose, Justice

Before Chief Justice Jones, Justices Rose and Goodwin

Affirmed

Filed:   August 20, 2014