TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-01-00072-CV







Izzat Davis, Appellant


v.


Texas Department of Protective and Regulatory Services, Appellee






FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT


NO. 175,084-B, HONORABLE RICK MORRIS, JUDGE PRESIDING







 Appellant Izzat Davis appeals the order terminating her parental rights to two
children. Appellant contends that the order is not supported by sufficient evidence, that the court
erred by admitting evidence of her convictions, and that the termination of her parental rights
violates her state and federal constitutional rights. We will affirm the judgment.

 Appellant and Antonilius Davis, Sr. ("Davis") had two children together--a boy, T.J.,
born April 24, 1997, and a girl, A.D., born June 29, 1998. Appellee Texas Department of Protective
and Regulatory Services ("the Department") removed them from appellant's care after T.J. suffered
fourteen brand-like burns in April 1999. Appellant did not seek medical attention for him until a
representative from Child Protective Services intervened--at least three days after appellant admits
discovering that some of the burns were more than superficial. The boy's assailant was unidentified
at the time of trial. There was no evidence of injury to A.D. in this incident.

 At trial, the court charged the jury that the court would terminate appellant's parental
rights only if the Department proved by clear and convincing evidence that at least one of the
following events occurred:


 1. The mother has knowingly placed the child in conditions and surroundings which
endanger the physical well-being of the child; or


 2. The mother has knowingly placed the child in conditions and surroundings which
endanger the emotional well-being of the child; or



 The mother has knowingly allowed the child to remain in conditions and
surroundings which endanger the physical well-being of the child; or 
 The mother has knowingly allowed the child to remain in conditions and
surroundings which endanger the emotional well-being of the child; or 


 

 5. The mother has engaged in conduct which endangers the physical well-being of
the child; or 


 6. The mother has engaged in conduct which endangers the emotional well-being
of the child; or



 The mother has knowingly placed the child with persons who engaged in conduct
which endangers the physical well-being of the child; or


 


 The mother has knowingly placed the child with persons who engaged in conduct
which endangers the emotional well-being of the child. 



See also Tex. Fam. Code Ann. § 161.001(1)(D) & (E) (West Supp. 2001). The court also charged
the jury that parental rights could be terminated only if clear and convincing evidence proved that
termination would be in the children's best interest. See id. § 161.001(2). The court instructed the
jury to consider the following factors in assessing the children's best interest: (1) the desires of the
children; (2) the emotional and physical needs of the children now and in the future; (3) the
emotional and physical danger to the children now and in the future; (4) the parenting ability of the
individuals seeking custody; (5) the programs available to assist those individuals to promote the
best interest of the children; (6) the plans for the children of those individuals or by the agency
seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the
parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any
excuse for the acts or omissions of the parent. See Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex.
1976). The jury found that appellant's parental rights should be terminated as to both children. (1)

 We first will consider appellant's complaints that the court erred by admitting
evidence of her conviction, then address her concerns regarding the evidentiary sufficiency and
constitutionality of the termination of her parental rights.

 Appellant contends that the district court erred by denying her motion in limine to
exclude references to her conviction for voluntary manslaughter of a child. She contends that the
prejudice of this evidence outweighed its probative value and that the Department introduced this
evidence to enrage rather than inform the jury. Appellant did not, however, raise this objection when
evidence of this conviction was repeatedly offered and admitted at trial. She acknowledges that a
trial court's denial of a motion in limine does not preserve error. See In re R.V., Jr., 977 S.W.2d
777, 780 (Tex. App.--Fort Worth 1998, no pet.). She contends, however, that the fact that her
conviction was mentioned by so many witnesses and documents rendered the "constant vigil" needed
to object to all such modes "impractical." She cites no authority and we find none creating such an
exception to the requirement of at least an initial objection at trial. See Tex. R. App. P. 33.1(a); see
also Chavis v. Director, State Worker's Comp. Div., 924 S.W.2d 439, 447 (Tex. App.--Beaumont
1996, no writ). Because appellant did not preserve the error she raises on appeal, we resolve issue
two in favor of the judgment.

 Appellant's complaint that the evidence is legally and factually insufficient to support
termination requires review of the entire record. We must determine whether clear and convincing
evidence supports the findings that the parent committed a dangerous act or omission and that
termination is in the children's best interest. See Tex. Fam. Code Ann. § 161.001 (West Supp.
2001). Clear and convincing evidence is a level of proof between preponderance of the evidence and
proof beyond a reasonable doubt; it is the measure or degree of proof that will produce in the mind
of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established. 
See Tex. Fam. Code Ann. § 101.007 (West 1996); Leal v. Texas Dep't of Prot. & Reg. Servs., 25
S.W.3d 315, 319 (Tex. App.--Austin 2000, no pet.). This heightened standard of proof is
incorporated into the standard of review. Id. at 320. In deciding a challenge to the legal sufficiency
of the evidence in a parental rights termination case, we consider only the evidence and inferences
tending to support the findings and disregard all contrary evidence. See id. at 319 (citing Garza v.
Alviar, 395 S.W.2d 821, 823 (Tex. 1965); In re King's Estate, 244 S.W.2d 660, 661 (Tex. 1951)). 
We must uphold the order if it is supported by more than a scintilla of probative evidence. Leal, 25
S.W.3d at 321. In determining a factual sufficiency challenge, we review all of the evidence, both
for and against the findings, and will set aside the judgment only if the proof is so obviously weak
or the findings so contrary to the weight of the evidence as to be clearly wrong and unjust. See id.
(citing Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); Garza, 395 S.W.2d at 823)). We will not
substitute our judgment for that of the trier of fact merely because we would make a different
finding. See Westech Eng'g., Inc. v. Clearwater Constructors, Inc., 835 S.W.2d 190, 196 (Tex.
App.--Austin 1992, no writ).

 We begin our chronological review of the evidence with appellant's 1988 conviction
for voluntary manslaughter of a child; the victim was one of her four children from previous
relationships. In addition to references to the conviction by many witnesses, the Department read
into the record testimony from a previous proceeding regarding the child's death. In that
prosecution, a neighbor testified that she heard appellant's child crying for an extended period of
time and saw appellant shake the child to quiet her, then extend her arms as if she had thrown the
child. The neighbor heard a sound, heard appellant say, "Now will you shut your damn mouth," and
then heard only silence; the neighbor did not see the child alive again. (In this termination case,
appellant denied causing her child's death. She posited that the child died of heat stroke.) Appellant
was convicted of voluntary manslaughter by various means of causing trauma to the child's head. 

 When appellant went to prison, her two surviving children were placed permanently
with their maternal grandmother. In 1991, appellant was placed on parole until 2009 and released
from prison. Appellant's next child, born in 1993, also was placed with appellant's mother. T.J.,
born in April 1997, was initially removed from appellant's care, but was returned to her and Davis
at six months of age.

 T.J.'s weight was the subject of much testimony. He weighed nine-and-a-half pounds
at birth. When he was returned to appellant and Davis at six months, he weighed twenty-one-and-a-half-pounds--the ninetieth percentile for weight for his age. By June 1998, however, he weighed
only sixteen-and-a-quarter pounds; this was well below the twenty-eight pounds his doctor expected
him to weigh. His concerned parents took him in for a medical examination. Medical personnel
testified that they recommended further testing and called the parents twice to set up appointments,
but the parents never followed up; the parents testified that they did not know that the doctors
recommended testing. Regina McCollum, a family friend, testified that, though T.J. had been happy
and active as a six-month-old, he grew quieter and substantially less active over the next year. She
testified that at seventeen months he had lost so much weight that his skin was hanging loosely on
him; the parents denied the boy looked that bad and posited that, if he had, doctors and others would
have called the Department.

 Testimony indicated other causes for concern about T.J.'s health, safety, and
development. T.J. went to the emergency room in May 1998 after he reportedly fell from an eight-inch-high chair; appellant said he never lost consciousness but vomited twice. A doctor described
this as a severe reaction to such a short fall. T.J. had a similar reaction and another emergency room
visit at twenty-one months when a woman reportedly opened a door and knocked him off a three-foot porch and onto a brick. A physician reviewing T.J.'s medical charts at trial said they showed
developmental delays and a failure to thrive. McCollum also testified that appellant and Davis tried
to potty train T.J. at eleven months, making him sit on his potty chair for hours; others testified that
eleven months was too young for such measures. Appellant denied forcing T.J. to stay on the potty
chair. McCollum also reported that, during a telephone call with her, appellant spanked T.J. for
"looking at her funny."

 In September 1998, McCollum volunteered to take T.J. into her home in Oklahoma
when he was seventeen months old and Davis was reassigned to Korea for a year. (Appellant
moved in with her mother in Belton and kept her daughter with her.) McCollum testified that T.J.
ate voraciously while in her care until appellant reclaimed him in December 1998. Appellant and
the two children moved into a one-bedroom apartment in Killeen. By April 1999, T.J. was near the
fiftieth percentile in weight for his age. 

 Much of the testimony focused on events from April 18-23, 1999. In early April
1999, Temeeka Garner temporarily moved into appellant's apartment with her three children. Also
in the apartment sometimes during this period was Jerry Gibson, an army officer who was married
to someone else. Also staying in the apartment for part of April were three children of another friend
who was in jail. On April 17, 1999, appellant's three older children also stayed in the apartment. 
Appellant returned her three older children to her mother's home on the morning of April 18.

 Appellant said that, on her return that afternoon, Garner told her that T.J. had gotten
her curling iron and burned himself. Appellant said she saw a couple of red places on his legs. She
testified that she treated them with antibiotic lotion. She said that some burns "popped out" on April
20, 1999; she also began to suspect that Garner was more involved in the burns than she had
reported. Appellant also testified that she found T.J. on April 20 with one of Garner's young
daughters pulling on his penis. Appellant said she did not see the burns on T.J.'s back, scrotum, and
penis, even though she bathed him. She did not take T.J. to the hospital, nor did she call her husband
or her mother. 

 Lorinda Vidal, T.J.'s godmother, picked him up on April 22, 1999 to take him with
her and her children on a planned visit to Waco. She said she noticed the burns on his legs when he
used the bathroom; she said Garner told her the burns were from a curling iron accident. Vidal did
not look for or see the burns on his genitals. She said T.J. played with her children without
noticeable discomfort.

 Apparently acting on an anonymous tip that T.J. had been injured, the Department's
investigator went to appellant's home at 11:30 p.m. on April 22, 1999 looking for T.J., who was still
with Vidal. Appellant said she did not know how to get into contact with Vidal. Later, though,
appellant went by Vidal's house and picked up T.J. to take him to appellant's mother's house. State
investigators located her there and persuaded her to take T.J. to the hospital.

 David Hardy, the physician who examined T.J. on April 23, 1999, said he found
fourteen burn marks, several bruises, and linear marks consistent with spanking with a switch. 
Several of the burn marks indicated precise placement rather than glancing blows; for example, the
burn on his scrotum did not have an associated burn on the inner thigh as would be expected if he
had dropped or accidentally brushed against a curling iron. Some of the burns had distinct edges,
indicating that the hot object was pressed into flesh. Hardy testified that some of the burns on T.J.'s
legs appeared to have been caused by a lighter. He said the bruises on the backs of T.J.'s arms and
legs are consistent with child abuse, possibly caused by someone restraining T.J. while inflicting the
burns. The doctor said the number and severity of the burns would take about thirty minutes to
inflict; both the number and the severity weighed against accidental infliction. Hardy said the burns
on T.J.'s legs would have immediately appeared serious; they would have been partially charred and
blistered. The doctor testified that T.J. would have pain when urinating and when the burns rubbed
against anything--e.g., when his genitals rubbed against his diaper. He testified that he saw no
indication that the burns had been treated.

 After this examination, the Department took T.J. and his younger sister and placed 
them with foster parents. The foster father testified that T.J. was in pain from the burns. He said
that, for about a month, T.J. would scratch some of the burns until he bled. He also said that T.J.
was aggressive toward women (including the foster mother and teachers) and would hit them. T.J.
also bit himself. 

 There was also testimony regarding appellant's psychological state. Frank Pugliese,
a psychologist who examined her in 1993 and reviewed subsequent reports on her condition,
characterized appellant as having a mixed personality disorder. He found her tense, abrasive,
irritable, defensive, and mistrustful. He said she appeared to be overwhelmed by responsibilities and
pressures, pessimistic, and cynical. A 1999 examination indicated that these symptoms persisted and
were accompanied by an avoidance of responsibility for making decisions. Pugliese found no
indications of problems with self-control or aggression, but conceded that these problems sometimes
show only under a particularly stressful event or after an accumulation of small stressors. He
testified that appellant's problems may cause her to misinterpret expressions and actions by
others--e.g., to think a child was looking at her funny. He testified that her mistrust would cause
her to distort or hide information regarding child abuse even if she is innocent. He said she might
also alter her memories of events (e.g., her daughter's death) in order to shield herself from
responsibility. There was evidence that appellant did not take advantage of opportunities for
psychological and parenting-skills counseling.

 Pugliese also testified regarding the gaps between T.J.'s behavior and those expected
for his age; the questions were hypotheticals that appear to be based on McCollum's observations. 
The psychologist said that seventeen-month-old children tend to run around rather than just sitting. 
He testified that a child who was seriously underweight and could not walk was having basic
physiological needs neglected. Pugliese testified that he would be required to report to the
Department if he saw a child whose weight loss caused skin to hang loosely from his body. He
agreed, however, that the fact that T.J.'s weight was normal after five months with appellant
indicated that she was feeding him sufficiently. He testified that aggression and self-mutilation are
signs of post-traumatic stress syndrome in children; though abuse is one trigger for PTSD, Pugliese
conceded that removal from parents could also cause it. He also testified that often, if one child is
targeted for abuse in a family and that kid is removed, the remaining children may be targeted.

 There is very little evidence regarding A.D.'s condition. There is no evidence that
she was injured when T.J. was burned; an examination at the time did not reveal any bruises. There
is no evidence that she endured the weight fluctuations or deficits that T.J. did. Appellant took A.D.
to the emergency room at nine months of age after she fell off of a couch.

 Appellant concedes that T.J. suffered burns, but denied that she is responsible for
them. There is no direct evidence that she inflicted the burns or knowingly and intentionally allowed
them to be inflicted; no witnesses testified to seeing the burning nor was any physical evidence
recovered linking anyone to the instrument used to inflict the burns. Appellant asserts that there was
no evidence that she knew or should have known that her son's well-being would be endangered by
leaving him with Garner. She contends that there was no evidence that her children were below
norms for growth and development while under her care; T.J.'s weight was in the fiftieth percentile
after five months in her care. There was no evidence of harm to her daughter. There was testimony
that she and her husband loved and cared for their children. 

 We conclude that there is factually and legally sufficient evidence to support the
jury's finding that appellant's parental rights to T.J. should be terminated. Regardless of whether
appellant was involved in burning T.J., she admitted that she did not seek medical assistance for him
until pressed to do so by the Department. Despite knowing that he was burned, she admitted
discovering only a few of the burns described by the doctor. She testified that she did not notice the
burns on his back or genitals even when she gave him a bath. Some of these burns were so severe
they would have immediately showed charring. Some of these burns became infected and took a
month to heal. Appellant admitted that she did not seek medical assistance or tell her husband about
the burns because she feared the consequences. A jury could reasonably find that the evidence
clearly and convincingly shows appellant committing an act that physically endangered T.J. by
failing to discover the burns and to seek suitable medical care for them.

 The jury's findings are supported by other evidence. The personal characteristics that
led appellant to avoid seeking medical help for T.J., coupled with her failure to seek help in changing
those characteristics, demonstrate a risk that appellant might in the future forego seeking medical
treatment for T.J. His weight loss and her failure to pursue treatment for it after the initial
appointment support the finding. The severity of T.J.'s symptoms after his reported fall off of a short
chair, his scars from being hit by a switch, and his developmental delays are cause for concern. 
Looming in the background is the possibility that appellant herself inflicted the burns; regardless,
appellant admitted that she allowed Garner to stay in her apartment even after she suspected that
Garner might have helped inflict the burns. Appellant's conviction for killing her daughter and her
denials of involvement in her daughter's death lend support to the jury's findings, as does her failure
to avail herself of opportunities for counseling. There is no evidence of the children's desires,
though T.J.'s hostility to mother figures is disturbing. There is no evidence regarding the suitability
of a particular placement, but there was testimony that the children were adoptable and could thrive
in a more hospitable environment. The evidence is legally and factually sufficient to support the
jury's finding that termination is warranted and in T.J.'s best interest.

 This evidence also supports the jury's finding that appellant's parental rights to A.D.
should be terminated despite the paucity of evidence that A.D. herself was ever physically harmed. 
The statute and the jury charge require that the Department show that A.D. was physically or
emotional endangered. See Tex. Fam. Code Ann. § 161.001(1)(E). The supreme court has written
that, "[w]hile we agree that 'endanger' means more than a threat of metaphysical injury or the
possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be
directed at the child or that the child actually suffers injury." Texas Dep't of Human Servs. v. Boyd,
727 S.W.2d 531, 533 (Tex. 1987). Misconduct directed towards one child can support a finding that
the parent engaged in a course of conduct that endangered another child. See Trevino v. Texas Dept.
of Prot. & Reg. Servs., 893 S.W.2d 243, 248 (Tex. App.--Austin 1995, no pet.). The jury reasonably
could have concluded that appellant's handling of the burning incident showed, at minimum, a
dangerous inattention to her child's physical condition and well-being, a subordination of her child's
health to her concerns, and a refusal or inability to take action to improve her child's safety. There
is also evidence that if the target of abuse is removed from the home, the abuse will be refocused on
a remaining child, increasing the risk to A.D. The evidence shows conduct and characteristics of
appellant causing present and future danger to children in her care, indicating that her children's best
interest is served by termination of her parental rights. We resolve issue one in favor of the
judgment.

 By her third issue, appellant contends that termination of her parental rights violates
her state and federal constitutional rights. The parties agree that the Department must show that its
interest is compelling, that its interest is particularly promoted by terminating the relationship, and
that it cannot achieve its goal through less restrictive means before terminating a parental
relationship. See In re S.H.A., 728 S.W.2d 73, 91-92 (Tex. App.--Dallas 1987, writ ref'd n.r.e.). 
Appellant argues that the Department's failure to present clear and convincing evidence to support
its case renders the termination unconstitutional; this argument fails because, as discussed above,
the Department satisfied its evidentiary burden. Appellant also argues that the Department failed
to show that it tried less draconian remedies. The State was faced with clear and convincing
evidence that the children were in danger in their home and that the danger would persist. During
more than a decade of her intermittent involvement with the child-protection system, appellant failed
to meaningfully engage in psychiatric counseling, either through the Department or the army, and
did not complete parenting skills training. She distrusted the Department so much that she declined
to seek medical treatment for burns that she insisted were inflicted either accidentally or by someone
else. Because the Department has a compelling interest in protecting its youngest citizens, because
there was no indication that appellant would participate meaningfully in a less intrusive alternative
to termination (i.e., a program to remove the danger to her children by improving her parenting
skills), and because termination promotes the State's interest in protecting the children by creating
the possibility that the children could be adopted into a home in which they can prosper, the
Department's actions do not violate the state or federal constitutions. See S.H.A., 728 S.W.2d 73 at
91-92. We resolve issue three in favor of the judgment.

 We affirm the judgment terminating appellant's parental rights to T.J. and A.D.



 

 David Puryear, Justice

Before Justices Kidd, B. A. Smith, and Puryear

Affirmed

Filed: December 13, 2001

Do Not Publish
1. The court submitted a similar charge regarding the parental rights of the children's father,
omitting items five and six regarding parental conduct that endangers the children's physical and
emotional well-being. The father does not appeal the court's termination of his rights in this case.