# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00286-CV

**Shirley Sawyer, Appellant**

**v.**

**Texas Department of Protective and Regulatory Services, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
NO. FM004649, HONORABLE DARLENE BYRNE, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Shirley Sawyer appeals from a decree terminating her parental rights to her two children, S.N.J. and H.N.H.[1] The Texas Department of Protective and Regulatory Services filed consolidated petitions for conservatorship or termination in a suit affecting the parent-child relationship. *See* Tex. Fam. Code Ann. '' 101.032, 161.001 (West 1996 & Supp. 2003). Following a four-day trial, the jury returned a unanimous verdict terminating Sawyer=s parental rights with respect to both children. Sawyer asserts five issues on appeal. In the first four, she

---

[1] The decree also terminated the parental rights of Chad Houser to his daughter, H.N.H. Houser has not appealed, and this opinion does not address the termination of his parental rights.

**urges that the evidence is legally and factually insufficient to establish the statutory grounds for termination. In the fifth, she asserts that her right to due process was violated by submitting to the jury a broad form charge that did not instruct them that at least ten jurors must agree on the same particular ground for termination. We hold that the record contains legally and factually sufficient evidence to support the termination and that Sawyer has not preserved her objection to the jury charge.**

## BACKGROUND

Because four of the five issues on appeal challenge legal and factual sufficiency, we include a detailed description of the evidence presented at trial.

The two children who are the subject of this appeal are S.N.J. and H.N.H., born on May 12, 2000 and April 10, 2001, respectively. The Department became involved with Sawyer and these two children when its hotline received a referral in April 2000 expressing concerns about the baby Sawyer was carrying. The Department investigated the referral and found Areason-to-believe@[2] there was **physical neglect because Sawyer was homeless and had a history of mental illness.**

---

**[2] A reason-to-believe is a finding that the Department makes after its investigation of an allegation of abuse or neglect when Department staff determine that, based on a preponderance of the evidence, the alleged abuse or neglect has occurred.** *See* **40 Tex. Admin. Code ' 700.511 (2003).**

In its investigation, the Department found that it had previously terminated Sawyer=s parental rights to her four older children, who are not the subject of this appeal. In September 1997, the Department had received a referral from a hospital alleging physical abuse of Sawyer=s then eleven-month-old son. After investigating, the Department found reason-to-believe there was physical abuse and removed Sawyer=s children from her care. Sawyer=s then-husband, Robert Santos, left the family after the children were removed. The couple later divorced. Testimony in the current case indicated that Santos had sexually and physically abused Sawyer during their marriage. The Department returned Sawyer=s children to her after Santos left, but removed them again a few months later after receiving reports of new injuries to the eleven-month-old and discovering that Sawyer no longer had stable housing.[3] After her four children were removed the second time, Sawyer did not maintain regular contact with the Department and only minimally complied with its requests. At one time, Sawyer left town for approximately nine months, contacted the Department by phone only twice, and did not contact or visit her four older children at all.

After these four children were removed, the Department offered various services to Sawyer including counseling, parenting classes, and psychological evaluations. In October 1997, psychologist Dr. Pugliese diagnosed Sawyer with bipolar disorder and noted that she had scored high on scales for mania and paranoia and was at high risk for acting unpredictably. Dr. Pugliese also recommended that she be medicated with Paxil, but did not ultimately prescribe it.

---

[3] Sawyer had been staying with a friend, who asked her to move out.

The Department also requested that Sawyer enroll her two middle children in daycare after her fourth was born. Sawyer refused.

Sawyer saw a counselor, Lynn Wells, from late 1997 to early 1998. In working with Sawyer, Ms. Wells noted that Sawyer denied or minimized problems, had unresolved mood issues, and did not respect the judgment of the professionals she had been seeing. In May 1998, Sawyer left town to join a carnival because the Department had requested that she find a job and she was unable to find anything locally. While employed with the carnival, Sawyer was ordered to pay a total of ten dollars a month in child support. Sawyer paid no support. The Department ultimately placed the four children with their paternal grandmother because Sawyer had failed to complete the tasks requested of her to reduce the risk of abuse and neglect to her children. Sawyer was named possessory conservator of these four children but was not granted any visitation with them; the children=s paternal relatives were ultimately named the children=s managing conservators.

After Sawyer=s fifth child was born, the Department met with Sawyer in the hospital to discuss its concerns for the infant. Sawyer and the Department agreed that S.N.J. would temporarily be placed with Sawyer=s sister in Killeen. During the next four months, Sawyer lived off and on in different hotels and worked when she could doing day labor. Sawyer visited her daughter S.N.J. only twice during this time.

In September 2000, Sawyer=s sister called the Department to say that she could no longer take care of S.N.J., as she had three young children of her own and S.N.J. had special

4

medical needs that she could not handle. Because Sawyer had not made any progress toward meeting the Department=s demands that she find stable housing and means, the Department petitioned the court for and was granted temporary managing conservatorship of S.N.J. on September 22, 2000. The Department placed S.N.J. with the childrens current foster parents, Mr. and Mrs. Epperson.

After the hearing, the court ordered Sawyer to attend parenting classes, to contact the Department of Mental Health and Mental Retardation (MHMR) to set up an intake assessment for psychiatric services, to obtain a psychological evaluation with Dr. Kilpatrick,[4] and to submit to random urinalysis. The court granted Sawyer weekly visitation, which she exercised for about three and a half months.

Sawyer saw Dr. Kilpatrick in September 2000. Dr. Kilpatrick diagnosed Sawyer with bipolar disorder, recommended that she be put on medication, and noted that Sawyer was emotionally shut down and failed to recognize that she needed treatment. In October 2000, Sawyer saw MHMR psychiatrist Dr. Shero, who found her to be manic and to exhibit tangential speech. Dr. Shero prescribed to Sawyer a three-month supply of Zyprexa, an antipsychotic. Sawyer was concerned about the possible effect of the medication on the fetus she was carrying and expressed these concerns to Dr. Shero. Dr. Shero assured Sawyer that the pills were safe for her fetus and that the benefits of taking them outweighed the risks.

---

[4] Each time that Sawyer was ordered to see a doctor she was also ordered to follow such doctors recommendations.

5

Sawyer began to take the medication, but stopped after two and a half months and failed to return for her follow-up appointment at the end of the prescription period. Over the course of the next several months, Sawyer missed at least two more appointments, and Dr. Shero did not see Sawyer again until September 2001Cnearly a year later. Dr. Shero advised Sawyer that she should get back on her medication and explained to Sawyer that bipolar disorder is a cyclic illness needing long-term management. Sawyer did not take any more medication and did not see Dr. Shero again. Dr. Shero testified that Sawyer=s interest in receiving help from MHMR was low, that Sawyer felt forced to come, and that she only minimally complied with the obligation to get psychiatric help. Dr. Shero testified that it was clear to her at their first meeting that Sawyer was manic and needed to be treated, especially as she was pregnant at the time and was not taking care of herself.

The Department had prepared a family-service plan for Sawyer in October 2000. The plan described the goals the Department had for Sawyer regarding mental stability, financial means, housing, and parenting skills; it included certain court-ordered requirements, such as completion of the parenting classes.

In December 2000, Sawyer was charged with several counts of making false statements to obtain credit. Sawyer lost her job and housing at the Austin Motor Inn in January 2001 as a result of the arrests. She was convicted of the charges and received three years= probation.

The Department prepared a second family-service plan for Sawyer in August 2001. Like the previous plan, this plan required Sawyer to meet requirements pertaining to housing, mental health, income, and parenting classes.

Since September 2000, the Department has also referred Sawyer to various therapists. Sawyer missed the first two appointments with one therapist. Sawyer was then referred to clinical social worker Tanya Glenn in late 2001. Ms. Glenn diagnosed Sawyer with borderline personality disorder. Sawyer frequently missed her appointments. Ms. Glenn eventually closed Sawyer=s case after her fifth no-show; it was her opinion that Sawyer was not making any progress toward being better able to parent her children. Ms. Glenn testified that she had concerns about Sawyer=s ability to parent her children based on her history, her lack of stability, and her refusal to acknowledge any of her weaknesses. Ms. Glenn further stated that she did not believe that Sawyer would be able to parent her children in the foreseeable future and that Sawyer=s parental rights should be terminated.

Sawyer never completed the parenting classes that the Department had set up for her because they did not fit in with her work schedule at the Austin Motor Inn. After she lost that job, she left town for a couple of months, staying with acquaintances and relatives. When she came back, she did not return to parenting classes, saying she lacked the money for transportation and the Department generally failed to give her bus passes to attend the classes.

A permanency hearing regarding S.N.J. was scheduled for March 30, 2001; Sawyer failed to appear because she said she started having contractions in her pregnancy with H.N.H. The court terminated Sawyer=s parental rights to S.N.J.

H.N.H. was born on April 10, 2001; the Department removed her from the hospital and scheduled a hearing for April 20. The court ordered Sawyer to contact MHMR to schedule a psychiatric assessment, participate in individual counseling, attend parenting classes, and submit to random urinalysis. The court appointed the Department temporary managing conservator of H.N.H. and granted Sawyer weekly visitation. H.N.H. was placed with her sister in the Eppersons= foster home. Sawyer visited her daughters only once over the next seven months.

The Department scheduled an appointment for Sawyer to see Dr. Korasco, a Department psychologist, in May 2001; Sawyer never showed up, saying that she got lost on the way and had no money to make a phone call for directions. Sawyer did not appear at the status hearing for H.N.H. on June 8, 2001. After this hearing, the court terminated Sawyer=s parental rights to H.N.H.

In August 2001, the trial court granted Sawyer=s motion for a new trial. The court held permanency hearings in September 2001 regarding both S.N.J. and H.N.H. Sawyer was ordered to maintain stable and appropriate housing and stable employment, submit to random urinalysis, complete parenting classes, and complete a psychological evaluation with Dr. Poole, a contract psychologist for the Department.

8

Dr. Poole saw Sawyer in October 2001 and testified that Sawyer likely has a personality disorder; he further opined that Sawyer could have difficulty relating to her children with empathic understanding of their needs and feelings. He also noted that Sawyer never took any responsibility for her actions or admitted any of her shortcomings. He stated that her personality disorder would have to be treated with psychotherapy, which is a long process and is only successful if the patient admits that there is a problem that needs to be resolved.

Dr. Poole also evaluated Chad Houser, Sawyer=s common-law husband who is the father of H.N.H. Dr. Poole diagnosed Houser with post-traumatic stress disorder (PTSD). Dr. Poole testified that mixing a personality disorder such as Sawyer=s with an individual who has PTSD is likely to create a volatile and emotionally overreactive relationship and that adding cocaine abuse on either side would result in a dangerous environment for children. Dr. Poole also opined that someone with Sawyer=s personality is likely to continue in a pattern of having relationships with people who make her feel good immediately without regard for their commitment or responsibility. Additionally, Dr. Poole testified that Sawyer was currently a danger to her children.

In January 2002, the trial court granted the Department=s motion to transfer and consolidate its suits regarding S.N.J. and H.N.H.[5] Additionally, the court ordered **Sawyer to complete protective-parenting classes and to participate consistently in individual therapy, among other requirements.**

_____

[5] The Department filed its original petition seeking termination or managing conservatorship regarding S.N.J. in the 98th Judicial District Court on July 19, 2000. It filed its original petition seeking termination or managing conservatorship regarding H.N.H. in the 126th Judicial District Court on April 11, 2001. The order granting the Department=s Motion for Transfer and Consolidation was signed on January 16, 2002. The order transferred H.N.H.=s cause to the 98th District Court and consolidated it with

A jury trial was conducted in late February 2002. At the time of the trial, Sawyer had completed only three of six protective-parenting class sessions and would not be able to miss any more to successfully complete the twelve-session class. She had completed only one of five homework assignments so far required for the class. As of the trial, Sawyer had visited with both S.N.J. and H.N.H. about a dozen times since H.N.H.=s birth the preceding April.

There was testimony from several witnesses, including Sawyer, that she had been the victim of past sexual and physical abuse inflicted by family members or family friends and various partners, including the father of her previous four children and her present common-law husband. A couple of weeks before the trial, Sawyer called the police when Houser, who had been smoking crack cocaine, got upset with Sawyer, hit their puppy, and slapped Sawyer in the face.

Sawyer tested positive for cocaine on two occasions C only two and three weeks before the trial. She claimed that she did not know at the time of the tests that she was pregnant with her seventh child. At trial, Sawyer testified that she and her common-law husband were currently residing rent-free with a seventy-one year old man in exchange for Sawyer=s housekeeping services to the man. Their lease forbade the use of drugs.

S.N.J. and H.N.H. have been with the same foster family since coming into the Department=s conservatorship. The family consists of Mr. and Mrs. Epperson and two

---

S.N.J.=s cause.

daughters—a teenager and a four-year-old. Mrs. Epperson is a "stay-at-home mom." She testified that she loves the two children, has bonded to them, and is hoping to adopt them.

S.N.J. is a child with special health and medical needs. She suffers from severe acid reflux disorder, a repetitive stomach convulsion that causes the contents of the stomach to come up the throat and either be vomited out or swallowed back down again. Mrs. Epperson testified that S.N.J. has a reflux every fifteen to twenty minutes throughout the day and much of the night. S.N.J. has a doctor's appointment every four to five weeks. She is allergic to rice, milk, and soy. Mrs. Epperson testified that S.N.J. needs a structured lifestyle and feeding schedule and that preparing S.N.J.'s special meals and dealing with her doctors and special formulas is an "all-day affair." If S.N.J. gets off her special diet and eats something such as a Goldfish cracker or a piece of candy, she will likely vomit and get diarrhea and respiratory problems for several days.

In addition, S.N.J.'s motor skills are below average, and her foster mother must frequently help her practice chewing food properly so that she can keep it down more easily and get the nutrition she requires. Mrs. Epperson testified that after visitations with Sawyer, the children are either "very hyper discombobulated" or exhausted and ready for a nap. Mrs. Epperson also testified that sometimes the children would return from their visits with Sawyer with sacks of items that were inappropriate either for their age or S.N.J.'s conditions—baby food that H.N.H. was not old enough to eat, foods to which S.N.J. was allergic, dirty stuffed animals, and potentially dangerous toys with parts too small for infants.

11

Tammy Bond, a supervisor with the Department who oversaw Sawyer=s case, testified that she thought it was in the children=s best interest to terminate Sawyer=s parental rights. When Ms. Bond met with Sawyer in August 2001 to review the latest family-service plan, Sawyer did not agree with the Department that she should change her Awhole parenting skills,@ gain stability in housing and finances, start attending her appointments regularly, and become more mentally stable. Ms. Bond testified that she did not believe Sawyer=s housing was stable as of the trial because it was dependent on her employment and, even though the lease forbade her to use drugs, Sawyer had twice tested positive for cocaine.

Ms. Bond also testified that during a recent visitation with Sawyer, S.N.J. took H.N.H.=s bottle, which may have had medication in it, but was unsafe anyway for S.N.J. due to her reflux. Sawyer did not notice the mix-up in bottles and failed to respond when the person who was supervising the visit pointed out the danger. Ultimately, this supervisor had to take the bottle away from S.N.J. On cross-examination, Sawyer stated that she had not been informed that H.N.H.=s bottle had medication in it. However, she also failed to recognize that even without medication, H.N.H.=s bottle would have been harmful to S.N.J. due to her allergies. Ms. Bond testified that Sawyer seemed overwhelmed with having to care for both children at the same time during visits and that she was often preoccupied with something other than her children, such as fixing a camera during one visit.

The jury found that the parent-child relationship between Sawyer and her two younger children should be terminated because at least one of the following events had occurred:

(1) she had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the children=s physical or emotional well-being; (2) she had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children=s physical or emotional well-being; (3) she had constructively abandoned the children who had been in the permanent or temporary managing conservatorship of the Department for at least six months; or (4) she had failed to comply with provisions of a court order that specifically established the actions necessary for her to obtain the return of her children; and that termination was in the children=s best interest.

## STANDARD OF REVIEW

We review the legal sufficiency of the evidence by considering all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party=s favor. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285-86 (Tex. 1998). We will uphold a finding if it is supported by more than a scintilla of evidence. *Leal v. Texas Dep=t of Protective & Regulatory Servs.*, 25 S.W.3d 315, 321 (Tex. App.C Austin 2000, no pet.) (overruled on other grounds by *In the Interest of C.H.*, 89 S.W.3d 17, 26 (Tex. 2002)).

The appellate standard for reviewing termination findings on a factual sufficiency challenge is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the State=s allegations. *In the Interest of C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). This standard retains the deference that an appellate court must have for the fact finder=s role. *Id.* at 26. When a reasonable jury could form a firm belief or conviction that

13

grounds exist for termination, the reviewing court must uphold a termination finding against a factual sufficiency challenge. *Id.* at 18-19.

## DISCUSSION

A petition requesting termination of the parent-child relationship may be granted if a court finds that: (1) the parent has engaged in any of the specific conduct set forth in the family code as grounds for termination and (2) termination is in the child=s best interest. *See* Tex. Fam. Code Ann. **'** 161.001(1), (2); *Texas Dep=t of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Hence we will affirm the termination of Sawyer=s parental rights if there is sufficient evidence of any one of the enumerated acts alleged by the Department and that termination is in the children=s best interest.

*Grounds for Termination*

The Department alleged four grounds for termination, one of which is constructive abandonment. To find that Sawyer had constructively abandoned her children, the jury had to find that (1) the children had been in the permanent or temporary managing conservatorship of the Department for at least six months; (2) the Department had made reasonable efforts to return the children to Sawyer; (3) Sawyer had not regularly visited or maintained significant contact with the children; and (4) Sawyer had demonstrated an inability to provide the children with a safe environment. *See* Tex. Fam. Code Ann. **'** 161.001(1)(N). Sawyer does not dispute that her

14

children were in the custody of the Department for at least six months.  Thus, we turn to the three other prongs to see if the evidence supports a finding of constructive abandonment.

First, we consider the Department=s efforts to return Sawyer=s children to her. Beginning as far back as 1997, the Department has attempted to improve Sawyer=s ability to parent and support all of her children through its services and referrals in the areas of therapy, parenting classes, and psychiatry.  With respect to the two children at issue in this case, the Department referred Sawyer to or set up appointments for her with several therapists and mental health specialists, namely Dr. Shero, Ms. Glenn, Dr. Kilpatrick, and Dr. Poole.  The Department referred Sawyer to organizations through which she could fulfill her parenting-class requirements. The Department reviewed service plans with Sawyer outlining its goals for her to achieve family reunification: that she become more stable with respect to housing, work, keeping appointments, and addressing her psychological needs.  It referred her to various agencies and organizations to help her in these areas.  The evidence demonstrates that the Department has provided resources again and again in an effort to help Sawyer address her mental illness and improve her parenting skills.

There is more than a scintilla of evidence establishing the Department=s efforts to return S.N.J. and H.N.H. to Sawyer by referring her to various therapists and parenting classes, and by communicating to Sawyer the steps that she would have to take to have her children returned.  This is not a case where the Department has failed Sawyer; the Department has given

15

her several chances, but Sawyer has not taken advantage of them. A reasonable jury could find that the Department made reasonable efforts to return Sawyer=s children to her.

Next, we consider the evidence of Sawyer=s contacts with her children. Sawyer visited her daughter S.N.J. only twice during the four-month period while the infant was living with Sawyer=s sister.[6] After the Department acquired temporary conservatorship of S.N.J. and H.N.H., Sawyer did not take full advantage of the visitation rights she was granted. At one time she failed to visit either child for a period of six months. When Sawyer did spend time with her young children, their interaction was strained and Sawyer was often distracted. Sawyer=s history with her four older children demonstrates a pattern of abandonment, highlighted by a stretch of no contact for ten months. A reasonable jury could come to a firm conclusion that Sawyer=s visits with these two children did not amount to regular visitation or significant contact.

Next, we consider whether Sawyer can provide her children with a safe environment. Sawyer has been diagnosed by doctors and therapists with several mental-health conditions, including bipolar disorder, personality disorders, and mania. More than one professional has testified that Sawyer needs to be on medication so that she can comply with the responsibilities of being a parent. However, Sawyer took herself off the first round of medication that was prescribed to her and never followed repeated advice to return to some form of medication. Sawyer has exhibited a pattern of ignoring the advice of her doctors and therapists.

---

[6] Sawyer initially testified that the number of visits was two, but Sawyer contradicted herself on this point later in the trial and asserted that she visited S.N.J. several times. However, Ms. Bond testified that the number of visits was two, and a jury could reasonably have concluded that the number of visits was two.

She has not accepted the fact that she is mentally ill and has refused treatment. That refusal endangers her children.

The jury heard testimony about Sawyer=s relationship with her common-law husband, Chad Houser. Sawyer testified that she and Houser lived together and that they planned to raise the children together. Houser has been violent towards Sawyer on at least one occasion. Dr. Poole testified that the potential for volatility in Sawyer=s relationship with Houser caused him concern for the children=s safety. Houser=s violence toward Sawyer and their dog supports Dr. Poole=s predictions, especially in light of cocaine use by both parties. Ms. Bond=s testimony and Sawyer=s drug use cast doubt on the stability of Sawyer=s housing and work.

Additionally, the evidence shows that Sawyer lacks the parenting skills necessary to provide her children with a safe environment. Sawyer testified that she considered french fries to be an appropriate food for a three-month-old. Her gifts of food and toys to her children were wholly inappropriate. She was preoccupied and overwhelmed at visitations.

The above amounts to more than a scintilla of evidence that Sawyer could not provide her children with a safe environment. With the foregoing evidence, the jury could reasonably conclude that Sawyer=s untreated mental disorders, her lack of parenting skills, and her drug use and contact with abusive men did not allow her to provide a safe environment for S.N.J. and H.N.H. Thus, we hold that there is legally and factually sufficient evidence that Sawyer constructively abandoned her children.

Two of the other grounds alleged by the Department assert that Sawyer endangered her children, either directly by engaging in endangering conduct or indirectly by allowing the children to be in endangering surroundings. Sawyer replies that she never even had possession of these children, as they were removed from her at the hospital, and that she therefore could not have endangered them. This argument might have some merit if Sawyer did not have a history of conditions and behaviors that are endangering to children: mental illness, housing and financial instability, relationships with violent men, and drug use. The Texas Supreme Court has held that a parent=s past actions can be relevant to a termination deliberation. *See In the Interest of C.H.*, 89 S.W.3d at 31-32. Although Sawyer argues that misconduct in the distant past is insufficient on its own to support termination,[7] evidence shows that she is still engaging in these behaviors and has not been willing to get help. In light of this evidence, we hold that a jury could reasonably conclude that Sawyer had engaged in endangering conduct.

Although Sawyer did not address the fourth alleged ground for termination in her appealCthat she failed to comply with provisions of a court order that established the actions necessary for her to have her children returnedCwe hold that the evidence also was legally and factually sufficient for termination on this ground. The court ordered Sawyer to take parenting classes on more than one occasion, and Sawyer has yet to complete a class series or to finish the associated homework. In violation of several court orders, she has not followed the

---

[7] Sawyer cites *Wetzel v. Wetzel*, 715 S.W.2d 387, 391 (Tex. App.CDallas 1986, no writ) (holding that misconduct toward a child in the distant past, standing alone, is insufficient to support the termination of parental rights).

recommendations of her doctors or attended therapy. We find the evidence legally and factually sufficient to support the grounds for termination.

*Best Interest of the Children*

We next examine whether there is sufficient evidence that termination was in the best interest of the children. Texas courts have enumerated considerations that may be relevant when determining the best interest of a child: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *Leal*, 25 S.W.3d at 322. This list of relevant considerations is not exhaustive; other factors may be considered when appropriate. *Holley*, 544 S.W.2d at 372; *Leal*, 25 S.W.3d at 322. Likewise, a fact finder is not required to consider all of the listed factors. *Leal*, 25 S.W.3d at 322. The absence of evidence about some of these considerations would not preclude a fact finder from reasonably forming a strong conviction that termination is in the children=s best interest, especially where undisputed evidence shows that the parental relationship endangers the children. *In the Interest of C.H.*, 89 S.W.3d at 28. As indicated in our discussion of the grounds for termination, Sawyer=s relationship

with her children could reasonably be viewed as being endangering if she does not receive treatment for her disorders and improve her parenting skills.

Because the children involved here are very young C about twenty-two months and ten months at the time of the trial C they did not or could not offer testimony as to their desires. From Sawyer=s infrequent and irregular contact with her children, it is unlikely that she has developed a significant emotional connection with them. As Dr. Poole testified, the children more likely view the Eppersons as their psychological parents; Mrs. Epperson testified that S.N.J. referred to her as Amama.@

Both children have been a part of the Epperson family since very early in their lives. The Eppersons desire to adopt them. As Ms. Bond and Mrs. Epperson testified, visitations between Sawyer and the children were not emotionally beneficial. Sawyer seemed overwhelmed by dealing with both young children together; the children returned from a one-hour visitation either hyperactive or worn out. The jury could infer that the children=s emotional needs have been met by the Eppersons and will continue to be best met in that environment.

S.N.J. has special dietary needs that must be closely monitored in order for her to develop properly and to keep her from having severe allergic reactions. S.N.J. requires frequent, regular feedings as well as close monitoring of her motor-skill development. Sawyer=s mental instability casts doubt on her ability to meet these needs. Mrs. Epperson has demonstrated that she is able and willing to tend to S.N.J.=s special needs. The jury could conclude that S.N.J.=s physical needs will be met best by the Eppersons.

The Department=s plan for S.N.J. and H.N.H. upon the termination of Sawyer=s parental rights was for the Eppersons to adopt the children.  Adoption in this case is a real possibility and would provide stability and permanency to these children that Sawyer is unlikely to be able to provide.  Sawyer=s history of homelessness and unemployment, drug use, relationships with violent men, and refusal to get help for her mental illness do not provide an assurance of stability and permanency.  Sawyer=s mental-health issues and her refusal to confront them undermines her ability to meet the physical and emotional needs of her children.  These facts weigh in favor of terminating the parent-child relationship for the sake of the children=s stability and their emotional and physical safety.

A large portion of the testimony was devoted to the availability of, and Sawyer=s response to, the various services and programs available to assist her in promoting her children=s best interest.  As already discussed, the evidence shows that Sawyer did not respond favorably or regularly to the Department=s referrals and the court=s orders for mental evaluations and help, therapy, and parenting classes.  Sawyer=s established pattern of not responding to such services weighs in favor of termination.

As already mentioned, Sawyer has demonstrated lack of comprehension of appropriate food and toys for her children.  She appeared distracted and overwhelmed at visitations. A jury could reasonably infer that Sawyer=s parenting skills are low, that Sawyer has not made genuine attempts to improve them, and that the children=s needs could be better met by the Eppersons.

21

Sawyer did testify as to what might be deemed excuses for her acts and omissions: that the Department failed to tell her about the extent of S.N.J.=s medical conditions, that visitations should have been scheduled for weekends, that the Department failed to give Sawyer Mrs. Epperson=s recipes for S.N.J.=s special foods, and that the Department scheduled services and requirements such as urinalysis and parenting classes on three different days of the week. However, the jury was free to assign what weight and credibility it chose to such excuses.[8] On the whole, the evidence weighs in favor of termination.

Taking all the evidence into consideration, we hold that there was more than a scintilla of evidence to support the jury=s finding that terminating Sawyer=s parental rights was in the best interest of the children. We further hold that the evidence is factually sufficient to support the jury=s finding. Although parental rights are of constitutional magnitude, they are not absoluteC we cannot sacrifice children=s emotional and physical interests merely to preserve those rights. *In the Interest of C.H.*, 89 S.W.3d at 26-27. The cumulative weight of all the

---

[8] In a legal sufficiency review we must view all of the evidence in the light most favorable to the Department, and therefore do not consider evidence of Sawyer=s excuses as weighing against termination. *See Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285-86 (Tex. 1998). However, we include evidence about Sawyer=s excuses for her acts and omissions for the purposes of our factual sufficiency review.

evidence could lead a jury to reasonably infer that Sawyer=s relationship with her children is not in their best interest. We thus overrule Sawyer=s fourth issue.

Because we hold that the evidence is legally and factually sufficient to support a finding that (1) Sawyer committed at least one of the Department=s alleged grounds and (2) termination was in the children=s best interest, the requirements of section 161.001(1) and (2) have been met.

*Violation of Due Process*

In her fifth issue, Sawyer argues that the jury charge violated her due-process rights because it submitted to the jury a broad form question with a disjunctive instruction regarding the grounds for termination that did not instruct the jury that at least ten jurors had to agree on the same particular alleged ground for termination. The Department responds that Sawyer failed to preserve this issue by not objecting at the trial court, and that, in any case, the charge did not violate her due-process rights.

To preserve error, parties must make all objections to the jury charge before the charge is read to the jury; all objections not so presented are waived. *See* Tex. R. Civ. P. 272; Tex R. App. P. 33.1(a). An objecting party must point out distinctly the objectionable matter and the grounds of the objection. *See* Tex. R. Civ. P. 274. For an objection to be valid, the party must make the court aware of the complaint, timely and plainly, and obtain a ruling. *See State Dep=t of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992). At trial, Sawyer made no objection to the jury charge. Thus, Sawyer has not preserved her objection to the jury charge.

23

**We therefore do not reach the issue as to whether a broad form jury question with a disjunctive instruction regarding the grounds for termination is appropriate in parental termination cases.[9]**

## CONCLUSION

**We overrule all of Sawyer=s issues and affirm the trial court=s order terminating Sawyer=s parental rights to S.N.J. and H.N.H.**

B. A. Smith, Justice

Before Justices Kidd, B. A. Smith and Yeakel

Affirmed

Filed:   February 27, 2003

---

[9] Were we to address the complaint, the Texas Supreme Court has held that a broad form jury submission does not offend a parent=s due process. *Texas Dep=t of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990).  The jury instruction at issue in *E.B.* was substantially the same as the instruction here.  But see *In the Interest of B.L.D.*, 56 S.W.3d 203, 219 (Tex. App.CWaco 2001, pet. granted), distinguishing *E.B.* by stating that the Court did not specifically address disjunctive questions and their effect on which of the alleged statutory grounds for termination occurred and thus holding that such instructions do violate due process.  We note that the appeal of this decision is now pending before the Texas Supreme Court.  We addressed the issue and rejected the Waco court=s position in *Cox v. Texas Dep=t of Protective & Regulatory Servs.*, No. 03-01-00511-CV (Tex. App.CAustin May 23, 2002, pet. denied) (not designated for publication), 2002 Tex. App. LEXIS 3651, at *6-8.

24