# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-15-00059-CV

**C. H., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

FROM THE DISTRICT COURT OF RUNNELS COUNTY, 119TH JUDICIAL DISTRICT
NO. 844, HONORABLE BEN WOODWARD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is an appeal from a final order, following a bench trial, terminating the parental rights of C.H. to his daughter, A.M.H., and his son, A.L.A.H.  In a single issue on appeal, C.H. asserts that the evidence is legally and factually insufficient to support the district court's finding that termination of C.H.'s parental rights was in the best interest of the children.  We will affirm the order of termination.

## BACKGROUND

The Texas Department of Family and Protective Services (the Department) brought suit to terminate C.H.'s parental rights to A.M.H. and A.L.A.H., who were three-and-a-half years and twenty months old, respectively, at the time of the termination trial.[1]  Following the trial, which

---

[1] The suit also involved a third child, I.H.E.M., who was raised by C.H. but was not his daughter.  Other parties to the termination suit were I.H.E.M.'s alleged father, C.M., and the mother

we discuss in more detail below as it is relevant to C.H.'s issue on appeal, the district court found by clear and convincing evidence that termination of the parent-child relationship was in the best interest of the children and that C.H. had committed the following statutory grounds for termination: (1) knowingly placed or allowed the children to remain in conditions or surroundings which endangered the physical and emotional well-being of the children; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children; (3) constructively abandoned the children; and (4) failed to comply with the provisions of a court order that specifically established the actions necessary for C.H. to obtain the return of the children.[2]  This appeal followed.

## STANDARD OF REVIEW

In a termination case, we ask whether the Department proved, by clear and convincing evidence, that the parent engaged in conduct that amounts to statutory grounds for termination and that termination is in the children's best interest.[3]  Clear and convincing evidence is a heightened standard of proof that requires "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."[4] On appeal, we apply a standard of review that reflects this burden of proof.[5]

of all three children, S.P., both of whom also had their parental rights terminated.  Neither S.P. nor C.M. are parties to this appeal.

[2]  *See* Tex. Fam. Code § 161.001(1)(D), (E), (N), (O), (2).

[3]  *See In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002).

[4]  Tex. Fam. Code § 101.007; *see C.H.*, 89 S.W.3d at 25.

[5]  *See In re J.F.C.*, 96 S.W.3d 256, 264-66 (Tex. 2002).

2

"In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true."[6] "To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so."[7] "A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible."[8] However, "[t]his does not mean that a court must disregard all evidence that does not support the finding."[9] The reviewing court must consider "undisputed facts that do not support the finding."[10] "If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient."[11]

In a factual sufficiency review, "the inquiry must be 'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's

---

[6] *Id*. at 266.

[7] *Id*.

[8] *Id*.

[9] *Id*.

[10] *See id*.

[11] *Id*.

allegations.'"[12] We "must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing," but we also "should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding."[13] "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient."[14]

## ANALYSIS

In his sole issue on appeal, C.H. asserts that the evidence is legally and factually insufficient to support the district court's finding that termination of his parental rights was in the best interest of his children. When deciding the best-interest issue, we consider the well-established *Holley v. Adams* factors, which include the children's wishes, the children's emotional and physical needs now and in the future, emotional or physical danger to the children now and in the future, the parenting abilities of the party seeking custody, programs available to help that party, plans for the children by the party seeking custody, the stability of the proposed placement, the parent's conduct indicating that the parent-child relationship is improper, and any excuses for the parent's conduct.[15] The Department need not prove all of the *Holley* factors as a "condition precedent" to termination, and the absence of some factors does not bar the factfinder from finding by clear and convincing

---

[12] *Id*. (quoting *C.H.*, 89 S.W.3d at 25).

[13] *Id*.

[14] *Id*.

[15] *See* 544 S.W.2d 367, 371-72 (Tex. 1976).

4

evidence that termination is in a children's best interest.[16] "The need for permanence is the paramount consideration for the child's present and future physical and emotional needs."[17] Moreover, a parent's statutorily offensive conduct is often intertwined with the best-interest determination.[18]

We begin our analysis with the evidence relating to C.H.'s statutorily offensive conduct. Sergeant Juan Para of the Winters Police Department testified that on April 29, 2013, he was dispatched to a residence in response to a call that two children had been injured and that the children's mother had been threatened with harm. Para recounted that, upon his arrival at the residence, he observed that one of the children, later identified as I.H.E.M., "had some red marks to the face area and to the neck area," and that the other child, a two-month-old infant later identified as A.L.A.H., "had bruises to both eyes and to the head and the chest and the left arm." According to Para, the children's mother, later identified as S.P., informed him that C.H. had caused the injuries to the children and "had threatened her that if the children were taken away or that if police officers were involved, that he was going to kill her." Para testified that A.L.A.H. was taken to the hospital, where he was diagnosed with a broken rib. Shortly thereafter, the Department filed suit to terminate C.H.'s parental rights. Meanwhile, C.H. was charged with and ultimately pleaded guilty to the offense of injury to a child. A copy of the judgment of conviction was admitted into evidence.

---

[16] *C.H.*, 89 S.W.3d at 27.

[17] *Dupree v. Texas Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 87 (Tex. App.—Dallas 1995, no writ).

[18] *Horvatich v. Texas Dep't of Protective & Regulatory Servs.*, 78 S.W.3d 594, 601 (Tex. App.—Austin 2002, no pet.) (citing *Holley*, 544 S.W.2d at 372; *Leal v. Texas Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 315, 321 (Tex. App.—Austin 2000, no pet.)).

While the termination suit was ongoing, C.H. was required to attend counseling sessions as part of his court-ordered service plan. Sharon Kay Oliver, a licensed clinical social worker who had counseled C.H. during the case, testified that when she asked C.H. to describe how A.L.A.H. had been injured, he explained to her that "the bassinet or the pen that the baby was in had collapsed, and that he grabbed the child up, and that he might have squeezed the child too hard, fracturing his rib." However, Oliver recounted, C.H. was unable to explain "the black eye or the injury to the face." Oliver further testified that C.H. had attempted to excuse the injuries to the infant by explaining to her "that he was living with a family that had a history of meth use, using meth, and he said that when a person's been on meth for several days, that a crying baby can be a problem." According to Oliver, C.H. minimized his responsibility for what had occurred and "basically denied doing anything to the child." As a result of his denial, Oliver testified, she was unable to help C.H. develop skills that might prevent him from harming the children in the future. She explained, "[T]he best situation is for the person to talk about exactly what happened, to be very open about it and transparent and remorseful and—and taking responsibility for their actions. That was what I was looking for. I didn't see that."

William Gustavus, another counselor who worked with C.H. during the case, provided similar testimony. Gustavus testified that although C.H. initially made progress in completing his service plan, he believed this progress was undone when C.H. began dating and living with a woman who, according to Gustavus, abused alcohol and had a pending charge for the offense of driving while intoxicated. Gustavus explained that one of the Department's initial concerns regarding C.H.'s parenting abilities related to his relationship with the children's mother, S.P., who, Gustavus claimed, had an extensive history of drug use. Gustavus testified that it took several

6

months of counseling for C.H. to acknowledge the extent of S.P.'s drug use and end his relationship with her, which is why Gustavus was "a bit disappointed when [C.H.] decided to begin another relationship with a woman who, very shortly in the relationship, abused alcohol and got a DWI." Gustavus believed that C.H. was in "denial" regarding the seriousness of the pending charge against his girlfriend and was "still struggling with acknowledging and accepting specific risk factors to his children's welfare." Additionally, Gustavus testified that as the case progressed, C.H. "grew increasingly adversarial with regard to the Department, things they were asking him to do," and "began to get defensive and start[ed] trying to defend this new paramour." As a result of this behavior, Gustavus "continue[d] to have concerns that [C.H.] could make decisions which assure the safety and welfare of his children."

While the case was ongoing, C.H. had supervised visits with the children, and the evidence tended to show that the children had mixed reactions to C.H. during these visits. Department witnesses who supervised the visits testified that the children often appeared excited to see C.H. and cried when they had to leave him. However, these witnesses also testified that C.H. would sometimes become angry with, impatient with, and inattentive to the children during the visits. Kelsey Zimmerman, a Department employee who supervised some of the visits, testified that, on one occasion, C.H. upset one of the younger children, causing that child to cry and the oldest child, I.H.E.M., to remark, "You're not going to hit us no more, Daddy." Tandy Lyons, another Department employee, testified that during one of the visits that she supervised, I.H.E.M. attempted to grab a piece of paper from underneath C.H., and C.H. responded by grabbing the child's arm, "yanking" her toward him, and yelling at her. According to Lyons, C.H.'s behavior caused the child to cry, become "frightened and scared," and hide from C.H. During another visit, the evidence

7

reflected, C.H. had made a video of the children to send to S.P. and, while filming the video, told I.H.E.M. to make a fist and say, on camera, "Mommy, I hit you." According to Brenda Tyree, the Court Appointed Special Advocate for the children, "[t]hat's not appropriate to tell a child." Tyree added that, in her opinion, "my gut feeling is if [C.H.] gets these kids, they're—they're not going to be safe."

The Department documented additional reasons why it believed terminating C.H.'s parental rights was in the best interest of the children. Donna Springer, the Department caseworker who oversaw the case, testified that the family had a history with the Department dating back to 2010, when there were allegations of physical neglect and neglectful supervision of I.H.E.M. by S.P. Springer recounted that there was also a history of domestic violence between C.H. and S.P., including an assault that C.H. committed against S.P. in 2012. According to Springer, S.P. told her that C.H. "would hit the kids. He was mean to her. He never would punch her, but he would hold her and kick her. A lot of verbal abuse, too, screaming." As part of C.H.'s service plan, Springer testified, C.H. was required to complete an anger-management program. Although C.H. obtained a certificate for completing the program, Springer believed that he had not made sufficient progress in managing his anger. This was demonstrated, Springer claimed, by the anger that C.H. had sometimes exhibited during visits with his children. Springer further testified that C.H. failed to follow the recommendations of his counselors and, on multiple occasions, missed counseling sessions.

C.H., during his testimony, admitted to injuring the children. However, when asked to explain how he had injured them, C.H. was unable to provide specific details of what had occurred. Instead, he testified that the injuries were "[d]ue to a lot of negligence and not paying

8

attention to what I was supposed to do as a parent and a father. And as far as the details as to what happened initially, I can't really put together, but I do know that—that I did it." C.H. added that "there was a lot of things that I was doing that left me to be not coherent enough to be paying attention to what I was doing." C.H. also admitted to "kicking" his children's mother in 2012, violating a protective order requiring him to stay away from her, using methamphetamine "once or twice," and living with his children in a home occupied by other methamphetamine users (although he claimed that he did not know that he was living with methamphetamine users until after he had moved into the residence). C.H. further acknowledged that prior to the removal of his children, he had what his attorney characterized as "anger issues." However, C.H. claimed that he had learned how to manage his anger while attending the court-ordered anger-management class. Pam Gabriel, the teacher of that class, testified that C.H. was "focused on changing things about himself" and had received "good" marks in the class for his attitude and group participation. But Gabriel also testified that during the final session of the class, C.H. had "made the statement that he had gotten upset, he broke a coffee table and punched a wall," which prompted Gabriel to downgrade her overall assessment of C.H.'s progress in the class.

C.H. testified that he loved his children and believed that he was now capable of providing a safe and stable environment for them. C.H. acknowledged that he lived with and had an ongoing romantic relationship with a woman who, the evidence tended to show, had a pending charge for driving while intoxicated. However, C.H. claimed that this woman "has been a good role model for me and my kids." C.H. also acknowledged that he had a history of mental illness, including a past diagnosis of bipolar disorder and ongoing anxiety. C.H. was unable to provide much detail regarding people who would be able to assist him in raising the children, although he

9

testified that he had "two very, very good friends" who could provide support and "take the kids for a couple of days" "if [parenting] does ever get too stressful for me or if I don't think I can handle it."

During the later stages of the case, the Department placed the children with foster parents. Emily Attaway, the foster mother, testified that the children had been in her and her husband's care for eleven weeks and that, during that time, the children have been "doing wonderful" and have made "significant improvements" in their behavior. For example, according to Attaway, when the children first began living with them, A.L.A.H. would sometimes bite other children and A.M.H. would throw "pretty significant tantrums." Attaway explained that she and her husband had taught the children that this was inappropriate behavior, that bad behavior had negative consequences, and that good behavior would be rewarded. Attaway testified that the children were learning these lessons and improving their behavior as a result. Attaway also testified that the bond between the children was "very, very tight" and that they "play really well together." During her testimony, Attaway expressed a desire to adopt the children. Tandy Lyons, the Department employee who supervised some of C.H.'s visits with the children, also observed the children's interaction with the foster parents. According to Lyons, "[t]he children are very bonded to the foster parents," are excited to see them, and call them "Mom" and "Dad."

In summary, the evidence supporting the district court's finding that termination of C.H.'s parental rights was in the best interest of the children included the following: (1) C.H. admitted to injuring the children, one of whom—an infant—had suffered a broken rib; (2) despite admitting that he had injured the children, C.H. attempted during his testimony to minimize his responsibility for the injuries and was either unwilling or unable to explain specifically what had occurred; (3) one of C.H.'s counselors believed that C.H. was "still struggling with acknowledging

10

and accepting specific risk factors to his children's welfare," while another counselor expressed concerns that C.H. would not be able to protect the children in the future based on what she perceived as his failure to show remorse or take responsibility for the children's injuries; (4) C.H. had a past relationship with a woman who abused drugs and an ongoing relationship with a woman who had a pending charge for the offense of driving while intoxicated; (5) C.H. had exposed his children to methamphetamine users and had himself used methamphetamine "once or twice"; (6) C.H. previously assaulted his children's mother; (7) C.H. had a history of anxiety and "anger issues" that, the district court could have reasonably inferred from the evidence, remained ongoing concerns; (8) the children, although they were excited to see C.H. during their visits, also indicated on at least one occasion that they were afraid of him; (9) the children's foster parents loved the children, had improved some of the children's problematic behavior, and wanted to adopt the children; and (10) the children were "very bonded" to their foster parents and called them "Mom" and Dad." Viewing the above and other evidence in the light most favorable to the district court's finding, we conclude that the evidence is legally sufficient to prove that termination of C.H.'s parental rights was in the best interest of the children.[19]

After giving due consideration to the disputed evidence in the case, we reach the same conclusion regarding the factual sufficiency of the evidence. There was disputed evidence regarding the desires of the children, as they demonstrated what witnesses characterized as strong bonds with both C.H. and their foster parents. There was also disputed evidence regarding the extent to which

---

[19] *See Holley*, 544 S.W.2d at 372; *Spurck v. Texas Dep't of Family & Protective Servs.*, 396 S.W.3d 205, 222-24 (Tex. App.—Austin 2013, no pet.); *In re W.S.M.*, 107 S.W.3d 772, 773 (Tex. App.—Texarkana 2003, no pet.); *In re U.P.*, 105 S.W.3d 222, 230-32 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

C.H. had complied with the Department's requirements to obtain the return of his children, as the evidence tended to show that C.H. did much of what the Department had asked of him, including completing an anger-management class, participating in parenting classes, and attending supervised visits with his children. Nevertheless, in light of the evidence supporting the district court's finding, summarized above, we cannot say that "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction" that termination of C.H.'s parental rights was in the best interest of the children.[20]

We overrule C.H.'s sole issue on appeal.

## CONCLUSION

We affirm the district court's order of termination.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton, and Bourland

Affirmed

Filed: July 23, 2015

---

[20] *See In re K.M.L.*, 443 S.W.3d 101, 117 (Tex. 2014); *J.F.C.*, 96 S.W.3d at 266.